# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

HIKO Energy, LLC,             :

           Petitioner      :

           :

        v.            :    No. 5 C.D. 2016

           :    Argued: December 14, 2016

Pennsylvania Public Utility      :

Commission,            :

           Respondent    :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE JULIA K. HEARTHWAY, Judge

**OPINION**
**BY JUDGE SIMPSON**             **FILED: June 8, 2017**

       This appeal presents a challenge to the Pennsylvania Public Utility Commission's (PUC) imposition of a civil penalty of approximately $1.8 million against an electric generation supplier[1] (EGS) which, during the polar vortex[2]

---

[1] An "electric generation supplier" is:

> A person or corporation, … brokers and marketers, aggregators or any other entities, that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an electric distribution company. …

**(Footnote continued on next page…)**

effects of the winter of 2014, intentionally billed its customers at a rate that exceeded the company's guaranteed introductory rate on nearly 15,000 invoices at the direction of its management and Chief Executive Officer (CEO).  In particular,

---

**(continued…)**

66 Pa. C.S. §2803.  Additionally, an "electric distribution company" or EDC, is: "The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers …." Id.

Each retail customer falls within the territory of a local EDC, and the price-to-compare is the default rate that a retail customer is billed by the EDC.  Id.; 52 Pa. Code § 54.182.  In 1996, the General Assembly enacted the Electricity Generation Customer Choice and Competition Act, 66 Pa. C.S. §§2801-2815, which allowed retail customers to purchase electricity directly from EGSs rather than their local utility and allowed EGSs to use the transmission and distribution facilities of EDCs.  Coalition for Affordable Util. Servs. & Energy Efficiency in Pa. v. Pa. Pub. Util. Comm'n, 120 A.3d 1087 (Pa. Cmwlth. 2015) (en banc).  While the PUC continues to regulate the transmission and distribution rates of EDCs, it lacks authority to regulate rates charged by EGSs to determine whether they are "just and reasonable," and it lacks the authority to compel EGSs to file tariffs.  Id. at 1101 (quoting 66 Pa. C.S. §1301).

[2] As explained by the National Weather Service and National Oceanic and Atmospheric Administration, the polar vortex is

> a large area of low pressure and cold air surrounding both of the Earth's poles.  It ALWAYS exists near the poles, but weakens in summer and strengthens in winter.  The term 'vortex' refers to the counter-clockwise flow of air that helps keep the colder air near the Poles.  Many times during winter in the northern hemisphere, the polar vortex will expand, sending cold air southward with the jet stream …. This occurs fairly regularly during wintertime and is often associated with large outbreaks of Arctic air in the United States.  The one that occurred January 2014 is similar to many other cold outbreaks that have occurred in the past, including several notable colder outbreaks in 1977, 1982, 1985 and 1989. …
>
> Polar vortexes are not something new.  The term 'polar vortex' has only recently been popularized, bringing attention to a weather feature that has always been present.  It is also not a feature that exists at the Earth's surface.

What is the Polar Vortex? Nat'l Weather Serv. & Nat'l Oceanic & Atmospheric Admin., http://www.nws.noaa.gov/om/cold/polar_vortex.shtml (last visited Feb. 14, 2017).

HIKO Energy, LLC (HIKO) asks whether the PUC erred or abused its discretion in imposing a civil penalty of this magnitude.

Specifically, HIKO argues the civil penalty constitutes an excessive fine in contravention of the Pennsylvania and U.S. Constitutions. HIKO further contends the PUC's civil penalty impermissibly penalizes HIKO for exercising its right to litigate this matter. It also asserts the PUC exceeded its statutory authority or abused its discretion by imposing a "per invoice" methodology in calculating the number of alleged offenses, resulting in an excessive, unprecedented civil penalty. Additionally, HIKO maintains the PUC improperly adopted the civil penalty recommended by the Administrative Law Judges (ALJs) in their initial decision, despite finding an absence of substantial evidence to support several key factual predicates for imposition of the penalty amount. Upon review, we affirm.

## I. Background

In February 2012, HIKO, which operates in several states, filed an application with the PUC to operate as an alternative retail electric supplier in Pennsylvania. Several months later, the PUC issued an order tentatively and conditionally approving HIKO's license to supply EGS services to residential, small commercial, large commercial, industrial and governmental customers in all electric distribution company (EDC) service territories, subject to certain reporting requirements regarding its sales and marketing practices. The conditions applied "for a term of 18 months [sic] from the start of [HIKO's] marketing activities in the [s]tate." ALJs' Initial Dec., 8/21/15, at 3. The PUC imposed the conditions based on the high number of complaints regarding HIKO that the PUC's technical

3

staff discovered in New York. Because no adverse comments to the tentative order were received, it subsequently became final by operation of law.

In December 2012, HIKO began marketing in Pennsylvania. HIKO's EGS license was subject to the 18-month conditional, probation period from December 2012 through June 2014.

HIKO's business model was to purchase energy on the spot market through a third-party energy trading firm. HIKO advertised, marketed, offered for sale and sold EGS services to retail customers in Pennsylvania through door-to-door solicitations, telephone solicitations and HIKO's website. HIKO delivers its energy to customers through local utilities. It began enrolling customers in Pennsylvania in variable rate plans on December 31, 2012.

Beginning in August 2013, HIKO offered a variable rate product that included a six-month introductory price guarantee. More particularly, in its welcome letter and disclosure statement, HIKO promised customers it would provide savings that were at least 1-7% less than the price-to-compare (PTC) of the customer's local utility (EDC) for the first six monthly billing cycles. Specifically, HIKO's welcome letter to customers stated:

> **Guaranteed Savings!** You have been enrolled onto a variable rate, which is <u>guaranteed to be 1-7% less than your local [u]tility's price to compare</u>, for the first six monthly billing cycles. After the six-month introductory rate plan, you will be automatically rolled over onto a competitive variable rate, which will be determined by [HIKO], based on numerous key factors, including

4

> current market conditions and climate. The variable rate
> can change regularly.

ALJs' Initial Dec., 8/21/15, Finding of Fact (F.F.) No. 45 (emphasis in original). HIKO also issued a "Disclosure Statement" to customers who enrolled in its price offering, which stated that the rate was the "price stated at sign-up and confirmed in your written Welcome Letter from HIKO." F.F. No. 46.

In January 2014, wholesale market prices for energy supply increased dramatically in part based on a period of sustained cold weather referred to as a "polar vortex," resulting in an increased use of electricity in Pennsylvania and the PJM Interconnection LLC[3] (PJM) service area. F.F. No. 21. Also during the winter of 2014, natural gas prices in Canada increased because of a change in regulation on the TransCanada Pipeline, indirectly contributing to increased demand and increased prices for natural gas in Pennsylvania. F.F. No. 22.

Prior to the polar vortex, PJM sales of electricity to HIKO were approximately $0.08 per kWh. The price increased approximately 300% to $0.227 per kWh in January 2014 and remained at or above $0.138 per kWh until the end of March 2014. During the winter of 2014, HIKO experienced an unexpected increase in the price of purchasing spot market wholesale electricity, and it found it difficult to obtain electric power supply except at exorbitant rates as supply costs tripled or quadrupled.

---

[3] PJM Interconnection LLC is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia. Metro. Edison Co. v. Pa. Pub. Util. Comm'n, 22 A.3d 353 (Pa. Cmwlth. 2011) (en banc).

HIKO's CEO Harvey Klein determined it was impossible for HIKO to stay in business while honoring the 1% less than PTC introductory rate guarantee; thus, HIKO's CEO and management made a business decision to *intentionally* overcharge approximately 5,700 customers enrolled in the guaranteed savings plan between January and April 2014. The approximately 5,700 customers enrolled in the guaranteed savings plan were billed an aggregate sales revenue of $3.29 million, approximately $1.8 million of which corresponded to overcharges not in accordance with the HIKO's welcome letter and disclosure statement. HIKO overcharged customers as much as $0.29 per kWh, or up to 400% the EDCs' PTC. The average overcharge that HIKO billed customers was $124. HIKO voluntarily ceased marketing its variable rate plan offerings in Pennsylvania by February 2014.

In January 2014, HIKO began receiving a large volume of telephone calls and emails from customers complaining about their bills, which overwhelmed HIKO's customer service department. In response, HIKO hired an additional 11 employees for its customer service department and enlisted a call center based in Florida to respond to customer complaints from all states in which it had customers.

Beginning in February 2014, HIKO voluntarily refunded approximately $160,000 to some of its complaining customers in Pennsylvania. It also instituted some changes to its business model, and it now purchases some energy under longer term contracts (*i.e.* six months), hedging against sudden increases in wholesale prices. HIKO no longer offers the guaranteed savings

introductory plan with its variable rate service; however, HIKO's CEO indicated a willingness to move forward with the plan in the future.

In March 2014, the PUC's Bureau of Investigation and Enforcement (I&E) initiated an informal investigation into HIKO as a result of customer complaints received by the PUC's Bureau of Consumer Services (BCS) regarding allegations that HIKO overcharged customers. In response to I&E's data requests, HIKO provided billing data for electric generation service it supplied to residential customers within each EDC service territory in which it operates and billed from January through April 2014. I&E reviewed HIKO's responses to the data requests, including spreadsheets with billing data HIKO submitted to EDCs from January to April 2014 for customers in the service territories of Duquesne Light Company, Metropolitan Edison Company (Met-Ed), Pennsylvania Electric Company (Penelec), PPL Electric Utilities (PPL), West Penn Power Company and PECO.

Thereafter, in July 2014, I&E filed a complaint against HIKO alleging that between January and April 2014, HIKO billed 5,708 customers at a rate that exceeded the discounted introductory rate it guaranteed to customers on 14,689 invoices. I&E alleged each of the 14,689 overcharges constituted a violation of 52 Pa. Code §54.4(a) (stating "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement."). I&E requested a civil penalty of $14,689,000 (or $1,000 per violation). It also asked the PUC to revoke HIKO's authority to operate as an EGS in Pennsylvania and to provide a refund to each customer. In response, HIKO filed an answer, new matter and preliminary

7

objections. The ALJs overruled HIKO's preliminary objections. A hearing ensued.

In the interim, the Commonwealth, by its then Attorney General, through the Bureau of Consumer Protection (OAG), and the Acting Consumer Advocate (OCA) (collectively, OAG/OCA), filed a joint complaint against HIKO with the PUC alleging HIKO engaged in misleading marketing and improper billing. OAG/OCA sought restitution, revocation of HIKO's EGS license and a prohibition on future deceptive practices. Ultimately, the ALJs approved a settlement in the OAG/OCA case pursuant to which HIKO agreed to: make restitution to customers who were overcharged as a result of its failure to adhere to the guaranteed introductory rate; a moratorium on accepting any new customers until June 30, 2016; and, make a contribution of $25,000 to the local EDCs' hardship funds. The restitution provided for in the settlement required HIKO to establish a refund pool of $2,025,383.85, in addition to the voluntary refund of $159,320.15 HIKO already provided, which would ensure overcharged customers received refunds so as to realize a 3.5% savings from their respective PTC rates for the period at issue.

At the hearing on I&E's complaint against HIKO, I&E presented the testimony of Daniel Mumford, manager of the BCS' Informal Compliance and Competition Unit. I&E also presented documentary evidence. For its part, HIKO presented the testimony of its CEO, Klein, and the rebuttal testimony of expert witness Charles J. Cicchetti, Ph.D., an independent consultant with a background

in economics and utility regulation. It also presented documentary evidence. After the hearing, the parties filed briefs.

The ALJs subsequently issued a decision in which they found that, between January and April 2014, HIKO intentionally billed customers at a rate higher than the rate guaranteed in its welcome letter and disclosure statement, resulting in customers not receiving the discounted guaranteed price. Additionally, the ALJs found HIKO was aware it did not honor the price offering when it broke the guarantee, and HIKO's conduct was not the result of negligence, administrative error or data glitch. Rather, HIKO made a decision to remain in business rather than abandon its Pennsylvania EGS license, and it decided to charge its customers in excess of the guaranteed price offering at enrollment. HIKO's failure to honor its price offering occurred while its license was subject to the conditions outlined in the PUC's June 2012 tentative order. The ALJs also found that if HIKO exited the retail electric market in Pennsylvania, HIKO's customers would have been transferred to default service provided by the local EDCs and would not have been deprived of essential electricity. Further, the ALJs found that HIKO's refunds to customers were initially made only to those customers who complained or filed complaints with governmental agencies. HIKO did not proactively issue refunds to all overcharged customers.

Ultimately, the ALJs granted, in part, I&E's complaint, denied as moot the request for customer refunds based on the settlement reached in the OAG/OCA case and denied the request for revocation of HIKO's EGS license in light of the settlement reached in the OAG/OCA case. The ALJs also granted

9

I&E's request for a civil penalty under Section 3301 of the Public Utility Code, 66 Pa. C.S. §3301, albeit in a lesser amount than that sought by I&E.

More particularly, the ALJs directed HIKO to pay a civil penalty of $1,836,125. The ALJs calculated the civil penalty by multiplying the number of violations of 52 Pa. Code §54.4(a), 14,689,[4] by $125, a figure that represented the approximate average overcharge per invoice. The ALJs imposed this penalty based on their determination that HIKO made a conscious decision not to honor its price savings guarantee to customers within the six-month introductory period, and, as a result, intentionally billed 5,708 customers in six separate EDC territories a total of 14,689 overcharges. In imposing the civil penalty, the ALJs undertook an analysis of the 10 factors and standards set forth in 52 Pa. Code §69.1201. That provision states:

> **§ 69.1201. Factors and standards for evaluating litigated and settled proceedings involving violations of the Public Utility Code and [PUC] regulations-- statement of policy.**
>
> (a) The [PUC] will consider specific factors and standards in evaluating litigated and settled cases involving violations of 66 Pa.C.S. (relating to Public Utility Code) and this title. These factors and standards will be utilized by the [PUC] in determining if a fine for violating a [PUC] order, regulation or statute is appropriate, as well as if a proposed settlement for a violation is reasonable and approval of the settlement agreement is in the public interest.

---

[4] The original number of 14,780 invoices was reduced to 14,689 invoices during the proceedings before the ALJs.

10

(b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding. The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.

(c) The factors and standards that will be considered by the [PUC] include the following:

(1) Whether the conduct at issue was of a serious nature. When conduct of a serious nature is involved, such as willful fraud or misrepresentation, the conduct may warrant a higher penalty. When the conduct is less egregious, such as administrative filing or technical errors, it may warrant a lower penalty.

(2) Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or property damage, the consequences may warrant a higher penalty.

(3) Whether the conduct at issue was deemed intentional or negligent. This factor may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty.

(4) Whether the regulated entity made efforts to modify internal practices and procedures to address the conduct at issue and prevent similar conduct in the future. These modifications may include activities such as training and improving company techniques and supervision. The amount

of time it took the utility to correct the conduct once it was discovered and the involvement of top-level management in correcting the conduct may be considered.

(5) The number of customers affected and the duration of the violation.

(6) The compliance history of the regulated entity which committed the violation. An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty.

(7) Whether the regulated entity cooperated with the [PUC's] investigation. Facts establishing bad faith, active concealment of violations, or attempts to interfere with [PUC] investigations may result in a higher penalty.

(8) The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount.

(9) Past [PUC] decisions in similar situations.

(10) Other relevant factors.

Id.

Before the PUC, both parties filed exceptions, which the PUC denied in an extensive, 56-page opinion. In short, the PUC adopted the ALJs' initial decision ordering HIKO to pay the $1,836,125 civil penalty. In determining the penalty was appropriate, the PUC stated it agreed that HIKO acted "knowingly and deliberately" and "effectively treated its own customers as the financial guarantors

12

of its own business plan, which backed contracts offering customers guaranteed savings with what was essentially a speculative supply portfolio based exclusively on spot market purchases." Commission Op., 12/3/15, at 44.

Thereafter, HIKO filed a petition for review to this Court. It also filed an application for stay, which a single judge of this Court granted, pending resolution of the appeal.[5] This matter is now before us for disposition.

## II. Issues

On appeal,[6] HIKO states the following issues:

1. Whether the [PUC's] determination to impose the highest civil penalty it has ever imposed against any entity, a civil penalty of $1,836,125 against HIKO, violates the Excessive Fines Clause of Article I, Section 13 of the Pennsylvania Constitution and the Eighth Amendment to the United States Constitution where the penalty is not reasonably proportionate in light of the underlying violations and the [PUC's] prior decisions approving much smaller penalties for similar or more egregious conduct?

2. Whether the [PUC's] unprecedented civil penalty of $1,836,125 impermissibly penalizes HIKO for exercising its right to litigate this matter, thus depriving HIKO of its right of appeal under Article 5, Section 9 of the Pennsylvania Constitution?

---

[5] Through his opinion and order, the single judge also required that HIKO file a bond in an amount equal to 120% of the civil penalty imposed by the PUC.

[6] When reviewing the PUC's findings and conclusions, our review is limited to determining whether constitutional rights were violated, whether errors of law were committed or whether the PUC's findings and conclusions were supported by substantial evidence. Bethlehem Steel Corp. v. Pa. Pub. Util. Comm'n, 713 A.2d 1110 (Pa. 1998).

13

3. Whether the [PUC] exceeded its statutory authority or, in the alternative, abused its discretion when it imposed a 'per invoice' methodology for calculating the number of alleged offenses, which resulted in an excessive and unprecedented civil penalty against HIKO?

4. Whether the [PUC] improperly adopted an unprecedented civil penalty of $1,836,125 that had been recommended by the ALJs, despite the [PUC's] finding of an absence of substantial evidence to support several key factual predicates for the imposition of such an amount?

Br. for Petitioner at 7 (Statement of Questions Involved).

### III. Discussion
### A. Excessive Fine
### 1. Contentions

HIKO first asserts the PUC's decision to impose a civil penalty of $1,836,125 violates the Excessive Fines Clauses of the U.S. and Pennsylvania Constitutions. HIKO argues that, in levying a nearly $2 million civil penalty against it, the PUC chose to impose the highest civil penalty in its nearly 80 year history without any evidence that HIKO was financially able to bear that penalty, without acknowledging the financial constraints HIKO faced during the polar vortex, and without considering the significantly smaller civil penalties the PUC approved in the settlement of analogous cases. Indeed, HIKO contends, the civil penalty imposed here is between 14 to 80 times higher than the penalties the PUC approved in cases involving other EGS companies for similar or even more egregious conduct, and is wholly disproportionate to the alleged violations, particularly given the significant mitigating circumstances supported by record evidence. Thus, HIKO maintains, as a constitutional matter, the PUC's civil penalty cannot be sustained because it is grossly disproportionate both to the

14

gravity of the alleged offense and to the magnitude of the fine the PUC approved against other similar offenders.

HIKO argues Pennsylvania law requires civil penalty determinations to be proportional to the alleged offense and to the treatment of other offenders for similar conduct. Pennsylvania's prohibition against excessive fines set forth in Article I, Section 13 of the Pennsylvania Constitution is coextensive with the Eighth Amendment to the U.S. Constitution. Commonwealth v. Eisenberg, 98 A.3d 1268 (Pa. 2014). Further, the proscription against excessive fines applies to a "civil penalty" if the penalty is designed, at least in part, to serve "either retributive or deterrent purposes." Austin v. United States, 509 U.S. 602 (1993).

HIKO argues the "dispositive inquiry" in determining whether a mandatory fine violates Article I, Section 13 of the Pennsylvania Constitution centers on the question of whether, under the circumstances, the fine is "irrational or unreasonable." Commonwealth v. Gipple, 613 A.2d 600, 602 (Pa. Super. 1992). Similarly, under the Eighth Amendment, a fine "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense[,]" a standard mirrored in the Pennsylvania Constitution. United States v. Bajakajian, 524 U.S. 321, 334 (1999); see Eisenberg.

In undertaking the proportionality test, HIKO maintains, the Pennsylvania Supreme Court relied on the test set forth in Solem v. Helm, 463 U.S. 277 (1983), which requires a court to compare the magnitude of the fine to the gravity of the offense, to the treatment of other offenders in the same jurisdiction

15

and to the treatment of the same offense in other jurisdictions. Thus, HIKO contends it was incumbent on the PUC to ensure the civil penalty it imposed here could be harmonized with its decisions approving civil penalties in other contexts, especially those involving similar violations. However, it asserts, the PUC did not do so.

HIKO argues the civil penalty here is grossly disproportionate to the treatment of other alleged offenders for similar or more egregious conduct. It argues the PUC seeks to justify the civil penalty by characterizing the intentional nature of the conduct, from HIKO's top management, combined with the magnitude of the violation as the two factors that most underscore the nature of the violation.

However, HIKO contends, those same factors are present in other proceedings involving similar or more egregious conduct, but which resulted in only a fraction of the civil penalty the PUC imposed here. Indeed, HIKO maintains, the grossly disproportionate nature of the penalty here is most clearly evidenced by the civil penalties assessed against other EGSs for engaging in very similar conduct.

HIKO cites numerous PUC proceedings involving EGSs, which it contends involved conduct substantially similar to that of HIKO and for which the EGSs received far lesser penalties. See Commonwealth v. Respond Power, LLC, Nos. C-2014-2438640, C-2014-2427659 (Apr. 22, 2016) (recommending $125,000 civil penalty for similar violations arising from variable rate price increases during

16

polar vortex period, including 52 Pa. Code §54.4(a)).  Pa. Pub. Util. Comm'n v. Energy Servs. Providers, Inc. d/b/a Pa. Gas & Electric, No. M-2013-2325122 (June 5, 2014), 2014 WL 2644840 (Pa.P.U.C.) (Pa. G&E) (approving $150,200 civil penalty for slamming allegations involving 319 customer accounts, characterized as among the most egregious conduct ever investigated by I&E); Commonwealth v. IDT Energy, Inc., No. C-2014-2427657 (Nov. 19, 2015), 2015 WL 7873831 (Pa.P.U.C.) (approving settlement with $25,000 civil penalty for alleged violations of PUC regulations for increasing variable rate prices during polar vortex period).

HIKO maintains each of these cases involved pricing decisions initiated by the EGSs' management that impacted thousands of customers during the polar vortex.  Yet, none of these enforcement proceedings resulted in a civil penalty remotely close to the penalty levied against HIKO. HIKO asserts the PUC's excuse—that settlement amounts are not precedential—misses the point.  In particular, the PUC, including the ALJs and I&E, had to apply the same factors under the PUC's penalty policy—including consideration of whether the penalty amount sufficed to deter future violations.   HIKO asserts the exponential differences in penalty amounts for violations against similar companies for similar violations arising from the same event cannot be justified on the ground that there was a trial against HIKO.  HIKO argues this disparity shows the lack of "intra-Pennsylvania" proportionality, which the Pennsylvania Supreme Court described as "imperative." Eisenberg, 98 A.3d at 1282-83.

HIKO further maintains the PUC's decisions approving civil penalties for similar violations, including Section 54.4(a), are not the only comparable cases.

17

It asserts the PUC also approved settlements with significantly lower civil penalties against EGSs that engaged in the more egregious act of "slamming,"[7] which the PUC described as fraudulent conduct for which it has "zero tolerance." Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. Pub. Power, LLC, No. M-2012-2257858 (Dec. 19, 2013), slip op. at 8, 2013 WL 6835126 (Pa.P.U.C.) at *5. Yet, despite the PUC's "zero tolerance" for "slamming," HIKO asserts, EGSs charged with slamming hundreds of customers paid civil penalties far lower than the penalty levied against HIKO. See, e.g., Pa. G&E; Public Power.

Further, despite its "zero tolerance" for slamming, HIKO argues, the PUC now attempts to discount the violations at issue in Public Power and Pa. G&E in order to justify the astronomical difference between the civil penalties it approved against those companies and the penalty imposed against HIKO. In its final order, the PUC characterizes the conduct of Public Power and Energy Services Providers as mistaken or initiated by a rogue, low-level employee, rather than a top executive or management. But, HIKO contends, a review of the factual findings in those cases reveals otherwise.

HIKO acknowledges there are very few PUC decisions applying the penalty policy factors in litigated cases. Here, the ALJs stated there were no PUC decisions applying the factors in a litigated case against an EGS like HIKO, or in a litigated case involving similar violations. Therefore, it could only rely on PUC

---

[7] "Slamming" is an unauthorized change made to a customer's supply service. See Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. ResCom Energy LLC, No. M-2013-2320112 (June 19, 2014), 2014 WL 2876696 (Pa.P.U.C.).

decisions approving settlements with other EGSs or approving settlements of other "serious" violations affecting thousands of customers.

HIKO further maintains a relevant factor in determining the appropriate penalty is the size of the company, which would bear on its ability to withstand the penalty and the amount needed for deterrence. 52 Pa. Code §69.1201(c)(8). It argues the PUC acknowledged that consideration of "size" was expressly mentioned in the penalty policy, but noted there was very little in the record on that point, stating—"[i]t is difficult to determine the size of HIKO"— except to note it was small in comparison with EDCs. ALJs' Initial Dec. at 49. HIKO contends that neither I&E nor the PUC offered anything to distinguish HIKO in size from any other EGS subject to regulatory proceedings that paid lesser civil penalties. Further, HIKO argues, in granting HIKO's stay application here, a single judge of this Court found "troubling," the PUC's failure to make any finding regarding whether the penalty was appropriate for a company of HIKO's size." HIKO Energy, LLC v. Pa. Pub. Util. Comm'n (Pa. Cmwlth., No. 5 C.D. 2016, filed February 12, 2016) (unreported) (single judge op.), Slip Op. at 6.

Moreover, HIKO asserts, the PUC gave no weight to its statements in approving settlements with far larger EDCs for far more serious violations. Those cases involved gas pipeline explosions, including several that caused deaths, serious injuries and millions of dollars in property damage, which the penalty policy explicitly defines as "consequences of a serious nature [that] … may warrant a higher penalty." 52 Pa. Code § 69.1201(c)(2); see, e.g., Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Utils., Inc., Gas Div.,

19

No. C-2012-2308997 (Feb. 19, 2013) (approving $500,000 civil penalty in connection with UGI's settlement of violations for inadequate leak detection measures and faulty pipeline replacement procedures that caused natural gas explosion resulting in five deaths, including two children, destruction of eight residences and substantial property damage). HIKO maintains that in that case the PUC rejected a proposed settlement with a $386,000 civil penalty, but accepted a $500,000 civil penalty as sufficient to deter future violations by UGI, a company far larger than HIKO. ALJs' Initial Dec. at 49 (noting that number of customers HIKO served was "small in comparison with the EDCs' respective customer counts"); see also Reproduced Record (R.R.) at 301a-03a (HIKO expert witness, Dr. Cicchetti, explaining the size of most EDCs in terms of rate base, balance sheets, revenue, income and access to capital are different than those of an EGS and therefore such larger companies are better able to absorb a multi-million dollar penalty).

HIKO further contends the PUC approved the $500,000 penalty knowing UGI was the subject of prior PUC proceedings for repeated, similar violations of pipeline safety and operating regulations over a five-year period that resulted in personal injuries and property damage. Perhaps even more telling, HIKO asserts, when the PUC apparently decided those prior penalties were inadequate and wanted to signify to UGI's management that it did not do enough to change its safety practices, the PUC approved a penalty of $1 million, or just 54% of the penalty levied against HIKO. See Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Penn Nat. Gas, No. M-2013-2338981 (Sept. 26, 2013), 2013 WL 5488626 (Pa.P.U.C.). HIKO contends approval of those

penalties as sufficient against a far larger EDC—and one that engaged in repeated violations that caused far more serious injuries—must be taken as an indication of what the PUC believes serves as adequate deterrence.

HIKO argues that, given its concededly much smaller size, its lack of any history of non-compliance, the extraordinary time period in which the violations occurred and the absence of any threat to public safety, it was arbitrary for the PUC to require an amount more than 80% higher than the UGI penalty in order to deter future violations by HIKO.

Also, HIKO asserts, in adopting and affirming the ALJs' factual findings, the PUC accepted the testimony of HIKO's energy expert, Dr. Cicchetti, who testified the polar vortex coincided with and exacerbated extraordinary regulatory disruptions in the wholesale energy markets. Thus, in addition to abnormally cold conditions during this period, prices for both natural gas and electricity surged to unanticipated (and unprecedented) levels. This too the PUC admitted. See Review of Rules, Policies & Consumer Educ. Measures Regarding Variable Rate Retail Elec. Prods., No. M-2014-2406134 (March 4, 2014), 2014 WL 1092815 (Pa.P.U.C.).

HIKO argues the unprecedented and exponential increase in spot market prices for wholesale electricity was felt by all EGSs and their variable rate customers. HIKO, in particular, faced severe financial difficulty in satisfying PJM collateral calls and meeting its ongoing monthly electricity purchase requirements. Had HIKO failed to satisfy PJM's increasing collateral calls, it asserts, it would

have been banned from participating in any PJM market activities and lost all its customers in every state in which it operated. Further, its failure to satisfy its PJM requirements also would have caused it to violate its EGS license requirements, which require HIKO to maintain PJM membership. HIKO argues none of this evidence was disputed by the PUC. Nevertheless, the PUC did not consider any of these circumstances as an excuse for HIKO's breach of its guaranteed rate promise, believing HIKO should have simply filed for bankruptcy or gone out of business.

HIKO points out that, in order to keep the company afloat during the polar vortex, its CEO personally guaranteed a $20 million loan and risked significant personal assets. HIKO argues it could not have survived if it continued to honor the price guarantee during the polar vortex. Again, it asserts, the PUC did not refute any of this evidence.

Instead, the PUC minimized the import of these unforeseeable conditions, affirming the ALJs' finding that the impact of the polar vortex and accompanying market disruption provided "no excuse" for HIKO's failure to honor the price guarantee because "the customer information [HIKO] provided with the guaranteed savings rate plan contained no reservations due to outside circumstances." Commission Op. at 47. The PUC further noted, "relying on the spot market for 100% of its supply exposed HIKO to known risks" and HIKO "knew or should have known that many moving pieces affecting the wholesale spot market were outside its control." Id. at 47, 48. Yet, HIKO argues, this rationale is undermined by the PUC's own admission regarding the unforeseeable nature of the polar vortex.

22

In addition, HIKO maintains, the PUC exceeded its statutory authority or abused its discretion in rejecting these mitigating circumstances based on an interpretation of HIKO's contract with price guarantee customers. First, HIKO argues, there is nothing in the Public Utility Code that authorizes the PUC to interpret the terms and conditions of a private contract between an EGS and its customers. Indeed, the PUC concluded its jurisdiction "does not extend to interpreting the terms and conditions of a contract between an EGS and a customer to determine whether a breach has occurred or setting the rates an EGS can charge." Office of Small Bus. Advocate v. FirstEnergy Solutions Corp. ("FES"), No. P-2014-2421556 (Jan. 26, 2015), slip op. at 18; see Adams v. Pa. Pub. Util. Comm'n, 819 A.2d 631 (Pa. Cmwlth. 2003); Allport Water Auth. v. Winburne Water Co., 393 A.2d 673 (Pa. Super. 1978).

Further, HIKO argues, the PUC's decision to penalize HIKO for allegedly failing to meet its price guarantee is nothing more than an end-run around controlling authority that deprives the PUC of the power to regulate EGS prices. HIKO argues nothing in the Public Utility Code authorizes the PUC to regulate EGS' prices. Thus, while Section 1301 of the Public Utility Code, 66 Pa. C.S. §1301, gives the PUC statutory authority to determine "just and reasonable" rates, those are rates demanded or received by a "public utility," which excludes EGSs. Specifically, Section 2806(a) of the Public Utility Code provides that "the generation of electricity shall no longer be regulated as a public utility service or function except as otherwise provided for in this chapter." 66 Pa. C.S. §2806(a). The definition of "public utility" in Section 102 of the Public Utility Code does not include EGSs except for the limited purposes in Sections 2809 and 2810 of the

23

Public Utility Code, 66 Pa. C.S. §§2809, 2810.  See Delmarva Power & Light Co. v. Pub. Util. Comm'n, 870 A.2d 901 (Pa. 2005).  HIKO contends those Sections have no bearing on prices charged by EGSs.

HIKO further asserts the PUC recognized its lack of jurisdiction to regulate prices charged by EGSs.  See Commonwealth v. Blue Pilot Energy, LLC, No. C-2014-2427655 (Dec. 11, 2014); see also CRH Catering Co. v. Blue Pilot Energy, LLC, Nos. P-2014-2451865, C-2014-2415277, C-2014-2415278, C-2014-2415281, C-2014-2415282 (Feb. 24, 2015), 2015 WL 849251 (Pa.P.U.C.).  HIKO maintains these rulings are consistent with prior PUC determinations, which indicated that the rates consumers pay in the retail electric market are governed by the terms of their contract with their EGS.  Thus, HIKO contends any attempt by the PUC to construe HIKO's contracts and enforce price terms through imposition of a civil penalty is expressly prohibited.

HIKO further argues the PUC's civil penalty analysis fails to properly consider HIKO's efforts to mitigate financial harm to its customers.  For example, HIKO voluntarily suspended all marketing efforts as early as January 2014.  HIKO argues that, as its CEO testified, HIKO was not in the business of making promises to Pennsylvania consumers it knew it could not keep.  HIKO maintains the ALJs agreed HIKO did not set out to defraud consumers by selling a guaranteed rate it knew it could not meet.   During the period of suspended marketing, HIKO asserts, its customer base (including customers under the price guarantee and other customers with pure variable rates) plummeted from about 10,000 to about 3,000.  HIKO argues this significant loss of customers, coupled with the growing financial

24

burdens of staying afloat resulted in significant financial losses. HIKO contends that, although the decision of other EGSs to voluntarily suspend the sale of variable rate products was previously considered a mitigating factor, see IDT Energy, the PUC refused to acknowledge it here.

HIKO also asserts it began issuing refunds to its price guarantee customers as early as February 2014. And, at the time the PUC issued its final order here, it simultaneously approved the settlement in the OAG/OCA case in which HIKO agreed to pay more than $2 million in restitution to Pennsylvania customers.

For these reasons, HIKO maintains, a civil penalty of $1,836,125 is grossly disproportionate when compared to other civil penalties the PUC imposed and when viewed in light of all mitigating circumstances. HIKO contends it bears no rational relation to the offense or the record, and, therefore, violates the excessive fines provisions of the U.S. and Pennsylvania Constitutions. See St. Louis, I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 67 (1919) (state-ordered monetary penalties violate due process clause's guarantee against unlawful deprivation of property when penalties are "wholly disproportioned to the offense and obviously unreasonable"). HIKO asserts the PUC here approved an unprecedented civil penalty that lacked record support and was unreasonably disproportionate to the sanctions levied against other alleged offenders for similar or more egregious conduct. Thus, this Court should set aside the civil penalty.

## 2. Analysis

Initially, our review of the notes of testimony of the ALJs' hearing as well as HIKO's pre-hearing memorandum reveals no mention of HIKO's assertion that the penalty I&E sought (which was *eight times* the amount of the penalty ultimately imposed by the PUC) would violate the Excessive Fines Clauses of the U.S. and Pennsylvania Constitutions. Nor did HIKO raise this issue in its brief after the ALJs' hearing.[8] Additionally, HIKO did not raise this issue in its exceptions to the ALJs' initial decision filed with the PUC. Indeed, in its opinion denying HIKO's emergency motion for supersedeas pending appeal to this Court, the PUC observed that HIKO failed to raise this issue at the appropriate stage of the proceeding, *i.e.,* in its exceptions following the ALJs' Initial Decision. R.R. at 1184a. Thus, this issue is waived. Lyft, Inc. v. Pa. Pub. Util. Comm'n, 145 A.3d 1235 (Pa. Cmwlth. 2016) (en banc) (petitioner's failure to raise issues before PUC results in waiver); Wheeling & Lake Erie Ry. Co. v. Pa. Pub. Util. Comm'n, 778 A.2d 785 (Pa. Cmwlth. 2001) (petitioner's claim that allocation of costs against it resulted in unconstitutional taking was waived where petitioner did not raise issue before ALJ or PUC).[9]

---

[8] In its reply brief, HIKO asserts it preserved this issue in its brief after the ALJs' hearing as well as in its answer and new matter filed in response to I&E's complaint. See R.R. at 83a, 837a. Our review of these documents reveals no mention of HIKO's present assertion that the proposed penalty would violate the Excessive Fines Clauses of the U.S. and Pennsylvania Constitutions.

[9] In any event, the primary case upon which HIKO relies in support of its excessive fines argument, Commonwealth v. Eisenberg, 98 A.3d 1268 (Pa. 2014), is distinguishable. There, the Supreme Court determined that the imposition of a $75,000 mandatory fine under the Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§1101–1904, based on a casino employee's misdemeanor criminal conviction for a single theft of $200 violated the Excessive Fines Clause of the Pennsylvania Constitution. Among other things, the Court stated:

**(Footnote continued on next page…)**

Further, as to those claims HIKO properly preserved before the PUC, we discern no error in the PUC's rejection of HIKO's assertions. With regard to our review of the PUC's decision, in Lyft, we explained:

> [T]he PUC's interpretations of the [Public Utility] Code, the statute for which it has enforcement responsibility, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous. [On review], the Court should neither substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within [the PUC's] expertise, nor should it indulge in the process of weighing evidence and resolving conflicting testimony.

---

**(continued…)**

> In our view, the fine here, when measured against the conduct triggering the punishment, and the lack of discretion afforded the trial court, is constitutionally excessive. Simply put, appellant, who had no prior record, stole $200 from his employer, which happened to be a casino. There was no violence involved; there was apparently no grand scheme involved to defraud either the casino or its patrons. Employee thefts are unfortunately common; as noted, appellant's conduct, if charged under the Crimes Code[,] [18 Pa. C.S. §§101–9402], exposed him to a maximum possible fine of $10,000. Instead, because appellant's theft occurred at a casino, the trial court had no discretion, under the Gaming Act, but to impose a minimum fine of $75,000—an amount that was 375 times the amount of the theft.

Eisenberg, 98 A.3d at 1285.

Unlike Eisenberg, and as discussed throughout this opinion, the supported findings of the ALJs and the PUC here reveal HIKO's management made a decision to intentionally charge its customers at a rate that exceeded its guaranteed rate on 14,689 invoices over a four-month period in violation of PUC regulations. The fine imposed here approximated the average overcharge on each of the 14,689 invoices and represented 12.5% of the maximum statutory fine allowable under Section 3301 of the Public Utility Code, 66 Pa. C.S. §3301.

Further, none of the cases HIKO cites in its discussion of the principles relating to an excessive fines analysis involve consideration of the constitutionality of a civil penalty imposed by a state agency.

27

The PUC's decision must be supported by substantial evidence, meaning more than a mere trace of evidence or suspicion of the existence of a fact sought to be established. The party seeking affirmative relief from the PUC bears the burden of proving its claims with competent evidence. That the record may contain evidence that supports a different result than that reached by the PUC is irrelevant so long as the record contains substantial evidence supporting the PUC's decision.

Lyft, 145 A.3d at 1240 (citations omitted). Further, this Court may not reduce a fine imposed by the PUC if the PUC has not violated constitutional rights, committed errors of law or failed to support its findings of fact by substantial evidence. Pub. Serv. Water Co. v. Pa. Pub. Util. Comm'n, 645 A.2d 423 (Pa. Cmwlth. 1994).

Here, we reject HIKO's argument that the civil penalty is disproportionate to the PUC's treatment of other entities that engaged in similar conduct. In rejecting HIKO's reliance on administrative proceedings involving other entities, the PUC explained that HIKO relied on settled rather than fully litigated cases and, in any event, the cases were factually distinguishable.

To that end, none of the cases HIKO cited involved intentional conduct directed by the company's highest-level executives such as that directed by HIKO's executives here, which involved the *intentional* decision to overcharge the accounts of more than 5,700 customers on nearly 15,000 invoices over a four-month period. F.F. Nos. 26 (citing Certified Record (C.R.), HIKO St. 1-R at 9; HIKO St. 2-R at 49; ALJs' Hr'g, 4/20/15, Notes of Testimony (N.T.) at 193-95), 72 (citing N.T. at 165, 217); ALJs' Initial Dec. at 38, 40, 41, 42, 46, 54, 56;

Commission Op. at 27, 53. Thus, as the PUC explained, "we believe that the intentional decision by top management and the broad scope of HIKO's violations substantially distinguish it from the cases upon which HIKO relies." Commission Op. at 27. The PUC observed:

> With respect to HIKO's claims that the ALJs did not properly consider the level of civil penalties approved against other EGSs, including those in settled cases, we find HIKO's argument to be erroneous. First, as to the precedential value of settlements … the well-established legal principle often invoked by and before [the PUC] [is] that settlements do not set precedent. Cases that proceed to a settled conclusion are often incomparable in many ways. For example, in *Public Power*, cited often by HIKO, the parties agreed to a settlement following an informal investigation by I&E, not the filing and full prosecution of a formal complaint as is the case here. Further, the settlement document itself in that proceeding, as is typical in settlements, stated that because settlements avoid the necessity of full litigation, all parties compromised their positions, and the investigated party, without admitting culpability, agreed to a lower penalty that avoided the possibility of more adverse consequences, including a higher fine. *See Pa. PUC Bureau of Investigation and Enforcement v. Public Power*, LLC, Docket No. M-2012-2257858 (Order entered August 29, 2013), Attached Settlement Agreement at 15, ¶ 36.

> HIKO also misstates the distinction between settled and litigated proceedings under our policy statement. While HIKO contends that our policy statement 'explicitly states' that the factors to be considered in both litigated and settled proceedings are the same, that oversimplifies the requisite analysis, which also explicitly provides that consideration of the factors will be applied more strictly in litigated cases, a provision overlooked by HIKO. *See* 52 Pa. Code § 69.1201(b). While we may consider the same factors, we do not consider them as strictly in settled cases. This is

29

not only because we encourage settlements but also, as the ALJs and I&E noted, the records in settled cases often contain substantially different evidence and <u>no admission of wrongdoing</u>. [ALJs' Initial Dec. at 52; I&E Reply Exceptions at 20]. <u>We also note that the third factor we consider, whether the conduct was intentional or negligent, is as HIKO asserted only considered in evaluating litigated cases</u>. <u>In this case, however, the intentional nature of the conduct, from [HIKO's] top management, combined with the magnitude of the violation, are perhaps the two factors that most underscore the egregious nature of the violation and support as a minimum the penalty recommended by the ALJs</u>.

Commission Op. at 52-53 (emphasis added) (footnote omitted).

As the PUC explained, and contrary to HIKO's assertions, the stringency in application of the factors and standards the PUC utilizes in evaluating cases involving violations of the Public Utility Code and its regulations differ in settled and litigated cases. Indeed, the PUC's penalty policy expressly states, in pertinent part (with emphasis added):

> (a) The [PUC] will consider specific factors and standards in evaluating litigated and settled cases involving violations of 66 Pa.C.S. (relating to Public Utility Code) and this title. These factors and standards will be utilized by the [PUC] in determining if a fine for violating a [PUC] order, regulation or statute is appropriate, as well as if a proposed settlement for a violation is reasonable and approval of the settlement agreement is in the public interest.

> (b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. <u>When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding</u>. <u>The parties in settled cases will be</u>

30

> afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. …

52 Pa. Code §69.1201(b). Further, as the PUC indicated, the third penalty factor, *i.e.*, whether the conduct at issue was intentional or negligent, "may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty." 52 Pa. Code §69.1201(c)(3) (emphasis added).

In addition, our independent review of the various PUC cases cited by HIKO reveals that *every case* involved a settlement. Further, those cases are factually distinguishable in that they involved: far fewer customer accounts[10] or far fewer purported violations;[11] alleged misconduct by a third-party vendor without the company's knowledge;[12] or no determination that the conduct at issue was intentional.[13] In specific response to HIKO's arguments regarding an approved penalty for UGI, those cases involved settlements (factors applied less strictly, case non-precedential), and involved no determination that the conduct at issue was

---

[10] Pa. Pub. Util. Comm'n v. Energy Servs. Providers, Inc. d/b/a Pa. Gas & Electric, No. M-2013-2325122 (June 5, 2014), 2014 WL 2644840 (Pa.P.U.C.).

[11] Commonwealth v. Respond Power, LLC, Nos. C-2014-2438640, C-2014-2427659 (Apr. 22, 2016).

[12] Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. Pub. Power, LLC, No. M-2012-2257858, (Dec. 19, 2013), 2013 WL 6835126 (Pa.P.U.C.).

[13] Commonwealth v. IDT Energy, Inc., No. C-2014-2427657 (Nov. 19, 2015), 2015 WL 7873831 (Pa.P.U.C.); Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Penn Nat. Gas, No. M-2013-2338981 (Sept. 26, 2013), 2013 WL 5488626 (Pa.P.U.C.); Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Utils., Inc., Gas Div., No. C-2012-2308997 (Feb. 19, 2013).

intentional. Also, the UGI cases did not involve an entity whose licensure was in conditional, probationary status. It is clearly within the PUC's discretion to distinguish this matter from the UGI cases on those bases.

Nevertheless, HIKO asserts the PUC erred in failing to consider various circumstances that were outside of HIKO's control during the period at issue, including the financial constraints it faced. As the PUC observed, however, HIKO's reliance on an 18-month pricing history did not serve as an adequate basis on which to *guarantee unconditional pricing savings of up to 7% for an initial six-month period*. Commission Op. at 46 (citing ALJs' Initial Dec. at 29); F.F. No. 13 (citing C.R., HIKO St. 1-R at 2-5). More specifically, during the period at issue here, HIKO made 100% of its electric purchases on the spot market. F.F. No. 13. Clearly, this practice assumed certain risks regarding the volatility of wholesale market prices. Commission Op. at 46 (citing ALJs' Initial Dec. at 29). And, even if HIKO

> did not foresee at the time of enrollment of customers in the 1-7% guaranteed savings plans the high risk HIKO or its variable rate customers were assuming because of the impending on-the-spot wholesale market price increases that were about to occur in [January 2014], the surprise does not justify the fact that the end-user customers enrolled in guaranteed savings plans are shouldering a substantial portion of the burden of the increase in wholesale rates.

Id. at 47 (citing ALJs' Initial Dec. at 29-30).

Further, the PUC and the ALJs specifically considered the various circumstances HIKO alleged were outside of its control, but found these

32

circumstances did not justify HIKO's actions. In particular, the customer information HIKO provided with its guaranteed savings rate plan contained no reservations based on outside circumstances. Thus,

> the polar vortex weather condition, the increase in natural gas prices due to the Canadian regulatory change, the increase in demand because of the weather, PJM's operational requirements, and/or the resulting spot market energy prices <u>do not constitute a good excuse for HIKO's business decision to not honor a guaranteed discount under the terms and conditions of its [p]rice [o]ffering nor mitigate the warranted imposition of a civil penalty in this case.</u>
>
> <u>There is no evidence to suggest that HIKO's disclosure statement or welcome letter indicated to the customer that its introductory rate would be dependent upon any of these aforementioned factors</u>. …

Commission Op. at 47 (quoting ALJs' Initial Dec. at 57) (emphasis added). No error is apparent in this reasoning. Indeed, HIKO's disclosure statement and welcome letter were devoid of any indication that the guaranteed introductory rate HIKO promised its customers was subject to change based on any of the various circumstances upon which HIKO now relies.[14]

---

[14] In a footnote, HIKO asserts, even if the PUC was authorized to engage in contract interpretation to enforce or regulate HIKO's prices, the PUC's determination that HIKO's customer information for the price guarantee program did not contain any reservations as to outside circumstances is contradicted by a plain reading of the contract. HIKO argues its terms and conditions included a force majeure provision, which states: "HIKO will not be liable for any interruptions caused by a Force Majeure Event, and HIKO is not and shall not be liable for damages caused by Force Majeure Events." <u>See</u> <u>Commonwealth v. HIKO Energy, LLC</u>, Dkt. No. C-2014-2427652, Joint Compl., App. A at ¶ 11. The provision defines "Force Majeure Events" to include acts of God. HIKO argues the polar vortex of 2014 may be reasonably characterized as an act of God, which is "[a]n overwhelming, unpreventable event caused exclusively by forces of nature." BLACK'S LAW DICTIONARY 37 (8th ed. 1999). Thus, HIKO asserts, the PUC's determination that HIKO's customer information offered no information **(Footnote continued on next page…)**

33

Moreover, the PUC agreed with the ALJs that HIKO's reliance on the spot market for 100% of its energy supply exposed HIKO to known risks, if not foreseeable events, given that numerous factors upon which the wholesale market depends were outside HIKO's control. Commission Op. at 47-48. As such, "HIKO [could not] credibly claim that relying on a market subject to so many known exposures is not inherently risky, such that they were risks [HIKO] apparently was willing to assume." Commission Op. at 48. In other words, it was or should have been foreseeable that exclusive reliance on the wholesale spot

---

**(continued…)**

regarding the impact of such unforeseeable and uncontrollable events is unsupported by the record.

Contrary to HIKO's assertions, when read in its entirety, we do not believe the provision of the customer disclosure statement upon which HIKO relies is helpful to its position. That provision states:

> **11. Force Majeure**. HIKO will make commercially reasonable efforts to provide electricity hereunder but HIKO does not guarantee a continuous supply of electricity to Customer. Certain causes and events out of the control of HIKO ('Force Majeure Events') may result in interruptions in service. HIKO will not be liable for any such interruptions caused by a Force Majeure Event, and HIKO is not and shall not be liable for damages caused by Force Majeure Events. Force Majeure Events shall include acts of God, fire, flood, storm, terrorism, war, civil disturbance, acts of any governmental authority, accidents, strikes, labor disputes or problems, required maintenance work, inability to access the local distribution system, non-performance by the EDC (including, but not limited to, a facility outage on its distribution lines or electric facilities), changes in laws, rules, or regulations of any governmental authority or any other cause beyond HIKO's control.

Commonwealth v. HIKO Energy, LLC, Dkt. No. C-2014-2427652, Joint Compl., App. A at ¶ 11 (emphasis added). We fail to see how this provision was sufficient to place HIKO's customers on notice that the six-month discounted rate HIKO guaranteed its customers could change based on the cold weather experienced in the winter of 2014.

Further, we disagree with HIKO that the polar vortex effects of the winter of 2014 constitute an act of God. Black's Law Dictionary defines an "act of God" as "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, flood, or tornado." Black's Law Dictionary 37 (8th ed. 1999) (emphasis added). We do not believe the polar vortex effects of the winter of 2014 fall within this definition, particularly in light of the enumerated examples.

34

market could, depending on the confluence of several independent factors at any one time, produce less than favorable pricing conditions. Id. In addition to the fact HIKO knew or clearly should have known many "moving pieces" affecting the wholesale spot market were outside its control, HIKO "also should have been able to foresee that relying on its customers as financial guarantors, when its finances were stretched because of those many circumstances outside its control, was not a valid option in the face of its contractual guarantees and existing regulatory protections." Id. Indeed, it was HIKO's sole decision how to structure a compatible price and supply scheme. F.F. No. 76 (citing N.T. at 162).

In an analogous situation, this Court rejected the PUC's determination that a public utility company established that it was subject to price increases that were outside of the public utility company's control, explaining:

> We agree with [the dissenting PUC Commissioner's] assessment that the [PUC's] interpretation is clearly erroneous because the plain meaning of the term 'outside of the control' does not means [sic] that ratepayers will act as the surety for companies that act to maximize their return, and not, as other utilities did, to protect their exposure from known and definable obligations.
>
> An event 'outside of the control' of a person or group typically refers to sudden illness, fire, theft, acts of God and natural disasters, not situations where a party can take actions to protect himself or herself from risk. See Peister v. State of Colorado, Department of Social Services, 849 P.2d 894 (Colo.Ct.App.1993). Strategic business planning always involves decisions on how much risk to accept and where the burden of risk is placed. In this case, [the public utility company] made a choice to divest itself of its generation assets and, unlike other utilities, not to protect itself by entering into long-term contracts within the rate caps to protect itself from

35

PLR ["provider of last resort"] costs. Instead, it made a bet that electric rates would remain below the rate caps and chose to maximize its profits. This was not an event outside of its control, but a conscious business decision. The General Assembly did not intend that if a utility lost money on choices it made, it would be allowed to recover more in rates. As [PUC] Commissioner Brownell stated, 'the statute did not establish a 'heads I win, tails you lose' construct.' Because an event that is "outside of the control" does not mean the results of business decisions, it was plainly erroneous for the [PUC] to allow revenues to be increased above the legislatively mandated rate caps.

ARIPPA v. Pa. Pub. Util Comm'n, 792 A.2d 636, 665-66 (Pa. Cmwlth. 2002) (en banc).

Further, HIKO's assertion that it lacked any prior history of non-compliance is unpersuasive. As to HIKO's history of operation as an EGS in Pennsylvania, the PUC tentatively and conditionally granted HIKO's application to operate as an EGS in June 2012. F.F. Nos. 5-6. Based on numerous complaints against HIKO in New York, the PUC conditionally approved HIKO's license subject to certain reporting requirements as to its sales and marketing practices. F.F. No. 6 (citing C.R., I&E St. 1 at 50-51). The conditions applied from December 2012 through June 2014. Id. As such, the violations at issue here (which occurred between January and April 2014), took place while HIKO's EGS license was subject to conditions on its sales and marketing practices. Given that the significant and abundant violations here began merely a-year-and-a-half after HIKO received tentative and conditional EGS license approval and all of the violations occurred while HIKO's EGS license remained in conditional status, we

reject HIKO's argument that the PUC erred in failing to consider its purported "history of compliance."

We also reject HIKO's argument that the PUC's failure to afford sufficient weight to HIKO's size in fashioning the civil penalty here warrants disturbing the PUC's decision. On that point, the PUC's penalty policy states, in relevant part: "The factors and standards that will be considered by the [PUC] include … [t]he amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount." 52 Pa. Code §69.1201(c)(8) (emphasis added). Here, the PUC clearly considered this factor. Commission Op. at 52. However, it was reluctant to place much weight on the ALJs' analysis of HIKO's size. The PUC agreed with the ALJs that as a supplier licensed in eight states, HIKO certainly had an opportunity to acquire a combined customer base, if not also economies of scale and scope, that could exceed that of any one EDC in Pennsylvania. Nevertheless, the PUC believed there was insufficient evidence on this point; as such, it placed little emphasis on its importance. Regardless, it found ample support for the remainder of the ALJs' analysis to adopt the recommended civil penalty. As discussed throughout this opinion, the record amply supports the PUC's decision regarding its imposition of the civil penalty. Further, as the ALJs recognized, the total amount of the civil penalty imposed here closely reflects the actual, aggregate overcharge that HIKO billed its customers. ALJs' Initial Dec. at 49.

In addition, we reject HIKO's contention that the PUC engaged in an "end-run" around controlling authority that deprives it of the power to regulate

37

EGS prices. The PUC has subject matter jurisdiction to regulate certain aspects of the services provided by EGSs. See Sections 2807, 2809 of the Public Utility Code, 66 Pa. C.S. §§2807, 2809. Under Section 2809(b) of the Public Utility Code, 66 Pa. C.S. §2809(b), EGSs are required to abide by PUC regulations. ("A[n] [EGS] license shall be issued to any qualified applicant, authorizing the whole or any part of the service covered by the application, if it is found that the applicant is fit, willing and able … to conform to the provisions of this title and the lawful orders and regulations of the [PUC] under this title, including the [PUC's] regulations regarding standards and billing practices ….").  For EGSs serving residential customers, this includes adherence to the regulations set forth in Title 52, Chapter 54, which relate to, among other things, bill format, disclosure statements and marketing and sales activities. See Herp v. Respond Power LLC, No. C-2014-2413756 (Dec. 17, 2014). As set forth above, Section 54.4(a) states: "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement." 52 Pa. Code §54.4(a). Thus, we reject HIKO's assertion that the PUC engaged in an "end-run" around controlling authority that deprives it of the power to regulate EGS prices here.

Similarly, we reject HIKO's assertion that the PUC exceeded its authority in interpreting HIKO's private contracts with its customers when the PUC determined HIKO breached its price guarantee. In this case, HIKO's CEO admitted that HIKO billed its customers in excess of its guaranteed introductory rate. N.T. at 165. As such, in analyzing this matter, the PUC applied its regulation and determined each overcharge constituted a violation of Section 54.4(a) of its

regulations. Thus, the PUC did not improperly engage in contract interpretation; rather, it applied its regulations to HIKO's admitted overcharges.

Finally, we reject HIKO's contention that the PUC did not properly consider HIKO's efforts to mitigate financial harm to its customers. On this point, the PUC determined (with emphasis added):

> It appears from the record that in the early phases of HIKO's overbilling, [HIKO] made no effort to voluntarily cease the overbilling. I&E Exhibits 12 and 13 show that only once customers filed informal complaints with BCS, did HIKO take action to refund overcharged amounts to customers. I&E Exhibits 12 and 13 are further supported by the testimony of HIKO's expert:
>
>> Q. Dr. Cicchetti, do you know if with regard to this proceeding whether HIKO had any specific remedial plan to provide refunds to the affected customers?
>>
>> A. I know before this proceeding began that they were dealing with customer complaints, and that they made refunds to specific customers who complained.
>
> N.T. [at] 204.
>
> As the spreadsheet data shows [sic], HIKO's overbilling occurred not as a single occurrence, but over a four-month period. There were at least four separate decisions to continue HIKO's pattern of overbilling – one for each of the January, February, March and April 2014 billing cycles. N.T. [at] 217. Taking this same logic even further, the spreadsheet data contained in Column 4 titled 'Invoice Data' in I&E Exhibits 6A through 11A shows [sic] multiple invoice dates for each month, suggesting that the decision to continue its scheme of

overbilling could have been confirmed prior to each and every invoice date.

> HIKO ceased offering the guaranteed rate in February, hired 11 additional customer service representatives, and contracted with an answering service in Florida to handle the numerous customer complaints from several States. [Klein] testified that HIKO now also purchases hedges regarding power supply, i.e. 6-month contracts. However, whether that alone is sufficient risk management to ensure that HIKO's variable rate prices do not exceed its guaranteed savings plans remains to be seen. There is no evidence the company modified its internal practices or procedures to address the conduct at issue. Of particular concern is that [Klein] testified he still intends to offer the 1% guaranteed rate. N.T. [at] 167-168. Thus, it appears the guaranteed savings plan is still a goal and part of the business model.

ALJs' Initial Dec. at 43; see also Commission Op. at 49. Additionally, the PUC explained:

> The ALJs were unpersuaded that HIKO's actions outside of those agreed to in *OAG/OCA-HIKO Settlement* warranted consideration of a lower penalty. We agree and find most compelling the ALJs' conclusion that HIKO's illegal billing practices continued for four consecutive months with [HIKO] beginning to issue refunds only after customers filed informal complaints with [the BCS].

Commission Op. at 49. Thus, we reject HIKO's assertions on this point.

### B. Penalty for Right to Litigate
### 1. Contentions

HIKO next argues the PUC's determination to impose a civil penalty of $1,836,125 impermissibly penalizes HIKO for exercising its right to litigate this

40

matter. In light of the PUC's refusal to consider civil penalty decisions in settled cases involving substantially similar allegations, HIKO asserts, the disproportionate civil penalty levied against it can have no other explanation than as a penalty because HIKO chose to litigate rather than settle this matter. HIKO contends the PUC approved the enormous civil penalty here, despite the fact it is nearly 80 times higher than the civil penalty it approved against another EGS for similar conduct during the same period. And, HIKO argues, the PUC's sole basis for rejecting any consideration of the amounts approved in those cases is because they were settled rather than litigated. Yet, as discussed above, HIKO asserts, there is no reason the penalty decisions in settled cases should have no bearing in determining an appropriate civil penalty here, given the dearth of litigated cases involving similar allegations, and the requirement that the PUC consider the very same penalty standards in both litigated and settled cases.

Further, while HIKO acknowledges a lower civil penalty is a common condition of a settlement, it asserts that the fuller evidentiary record in a litigated proceeding does not justify an exponential increase in the civil penalty, especially where HIKO was never presented with any real option than to settle this matter. To that end, HIKO argues, when I&E initiated this proceeding before the PUC, HIKO was faced with a claim for $15 million in civil penalties, potential license revocation and a refusal to settle on any terms other than a multi-million dollar penalty. HIKO asserts it had no practical alternative except to litigate the penalty action. Having done so, the PUC imposed its highest ever penalty, effectively punishing HIKO for refusing to settle. And, in affirming this unprecedented

41

penalty, HIKO contends, it was penalized again by not being allowed to rely on any settled cases as precedent to show that a lesser penalty was appropriate.

Under the Pennsylvania Constitution, HIKO argues, it had a right to refuse settlement and litigate this matter, including through an appeal to this Court. Article 5, Section 9 of the Pennsylvania Constitution provides for appeals to courts of record from administrative agencies. It states: "[T]here shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court …." PA. CONST. art. 5, §9. HIKO maintains that, by imposing astronomical and disproportionate civil penalties against it simply because it decided to exercise its right to litigate, the PUC impermissibly attempted to chill HIKO's right of appeal. If pursuing litigation results in a disproportionate civil penalty, HIKO argues, parties will inevitably be coerced into abandoning their rights to litigate civil penalty assessments regardless of the merits of the cases against them.

HIKO argues that an action by the government that unnecessarily chills the exercise of a constitutional right is invalid. See Commonwealth v. Brown, 26 A.3d 485 (Pa. Super. 2011) (citing United States v. Jackson, 390 U.S. 570 (1968)). It asserts the stark disparity between the civil penalty ultimately assessed against it and the civil penalty assessed against other EGSs for the same or even more egregious conduct underscores the arbitrariness of the PUC's decision and compels the conclusion that the amount reflects, not what the record evidence warranted, but a punishment for HIKO's decision to litigate. HIKO contends that permitting the PUC to enforce this unsubstantiated civil penalty

42

violates HIKO's right to due process in that it places too high a price on HIKO's constitutional right to litigate this matter.

## 2. Analysis

We reject HIKO's argument that the PUC imposed the civil penalty here based on HIKO's choice to litigate rather than settle this matter. Rather, our review of the decisions rendered by the ALJs and the PUC reflects that, in fashioning the civil penalty here, the tribunals applied the 10 factors set forth in the PUC's penalty policy to the facts presented.

Further, with regard to HIKO's repeated assertions that the PUC erred in failing to consider settled case, the PUC previously explained that it "vigorously, and without equivocation, reject[s] considering a settlement as precedent, as to <u>any</u> subsequent issue, in <u>any</u> proceeding." <u>Pa. Pub. Util. Comm'n v. The Bell Tel. Co. of Pa.</u>, No. R-811819 (Nov. 10, 1988), 1988 Pa. PUC LEXIS 572 at *19 (emphasis in original). Thus, "the [PUC's] approval of a settlement does not establish legal precedent, because parties frequently waive their legal rights regarding certain issues in a settlement." <u>Customer Assistance Programs: Funding Levels & Cost Recovery Mechanisms</u>, No. M-00051923 (Oct. 19, 2006), 2006 WL 6610966 (Pa.P.U.C.) at *11.

To that end, as set forth above, HIKO mischaracterizes the PUC's penalty policy statement as it pertains to litigated rather than settled cases. As stated above, "[w]hen applied in settled cases, [the penalty policy] factors and standards <u>will not be applied in as strict a fashion as in a litigated proceeding</u>." 52 Pa. Code §69.1201(b) (emphasis added). Thus, the parties in settled cases will be

afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. Id. Additionally, the third penalty factor, which involves a determination of whether the conduct at issue is intentional or negligent, and which the PUC considered of great import here, "may only be considered in evaluating litigated cases." 52 Pa. Code §69.1201(c)(3) (emphasis added). Indeed, when conduct is deemed intentional, it may result in a higher penalty. Id.

Further, as explained above, the settled cases upon which HIKO relies are factually distinguishable. In particular, none of the cases HIKO cited involved intentional conduct directed by the company's highest-level executives such as that directed by HIKO's CEO and management here, which involved the *intentional* decision to overcharge the accounts of more than 5,700 customers on nearly 15,000 invoices over a four-month period. F.F. Nos. 26 (citing C.R., HIKO St. 1-R at 8-9; HIKO St. 2-R at 49; N.T. 193-95), 72 (citing N.T. at 165, 217); ALJs' Initial Dec. at 38, 40, 41, 42, 46, 54, 56; Commission Op. at 27, 53. Indeed, the PUC stated that the two factors that highlighted the egregious nature of the violations and supported the penalty determination were: (1) the intentional nature of the conduct from HIKO's top management; and, (2) the magnitude of the violation. Commission Op. at 53. Indeed, I&E's witness, Daniel Mumford, manager of the BCS' Informal Compliance and Competition Unit, testified: "I'm not aware of any previous case whether this large [a] number of customers were overcharged deliberately." N.T. at 132; see also N.T. at 124 (Mumford testified "I'm not aware of any comparable cases, cases that could be compared to this one. …"). Therefore, contrary to HIKO's assertions, there is no indication the PUC

imposed the penalty here based solely on HIKO's decision to litigate rather than settle this matter.

In addition, while HIKO claims the PUC penalized it for refusing to settle, it points to nothing in the record that substantiates this bald assertion. To that end, through its complaint I&E sought the maximum penalty of nearly $15 million (based on the statutory maximum fine of $1,000 per violation), see R.R. at 41a, and the PUC ultimately imposed a penalty that was one-eighth (or 12.5%) of that amount, or $1,836,125. Thus, while the PUC's policy is to "encourage settlements," 52 Pa. Code §5.231(a), there is nothing to indicate that HIKO was compelled to litigate rather than settle this matter.

For these reasons, we reject HIKO's argument that the PUC's imposition of the civil penalty here impermissibly penalized HIKO for exercising its right to litigate this matter.

### C. Penalty Computation
### 1. Contentions

HIKO next maintains the PUC erred in applying a "per invoice" methodology that resulted in a finding of 14,689 separate violations. HIKO argues its failure to honor the price guarantee during the polar vortex was the result of a single business decision, not 14,689 separate decisions to overcharge customers. Also, by adopting a penalty computation based on invoices rather than prices actually billed, HIKO asserts, the ALJs arrived at a civil penalty that improperly penalized HIKO for actions that did not violate PUC regulations.

HIKO contends that, as the PUC found that HIKO's alleged overcharges violated Section 54.4(a) of the PUC's regulations, each day its business decision remained effective constituted a separate and distinct offense. See 66 Pa. C.S. §3301(b). As such, the PUC was required to apply a civil penalty for each violation of Section 54.4(a) during the four months affected by the polar vortex. Even if the PUC applied the maximum penalty of $1,000 for each day's violation, HIKO asserts, the PUC would have arrived at a total civil penalty of $120,000—a penalty proportional to the civil penalties levied against other EGSs for similar violations.

HIKO argues the PUC's "per invoice" methodology is contrary to the language of Section 54.4(a), which provides: "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement." 52 Pa. Code §54.4(a) (emphasis added). HIKO contends the regulation does *not* state that each EGS *invoice* must conform to the marketed price. HIKO asserts the invoice amount and the actual amount billed to a customer may be different, as the PUC acknowledged by its decision to remove "re-billed" charges from the total number of alleged violations. R.R. at 902a. Moreover, HIKO maintains, it did not "bill" customers itself; rather, the customer's local EDC actually sent the invoices. HIKO's customer records simply showed each customer's account, the usage, the rate and the total charges over specific periods. HIKO argues I&E did not produce a single customer invoice to support its case. It asserts this distinction is critical where, as here, there are thousands of customer billing entries in HIKO's records and each instance in which the "amount invoiced" is actually billed to a customer can carry a civil penalty up to $1,000.

46

Further, HIKO maintains, based on his industry experience, its expert, Dr. Cicchetti, offered a number of explanations as to why approximately 300 invoice entries in HIKO's records were likely not billed to customers. HIKO argues I&E offered no proof one way or the other, and thus did not carry its burden of proving those occurrences constituted violations.

## 2. Analysis

Section 3301 of the Public Utility Code ("Civil penalties for violations") states, in relevant part:

> **(a) General rule.--**If any public utility, or any other person or corporation subject to this part, shall violate any of the provisions of this part, or shall do any matter or thing herein prohibited; or shall fail, omit, neglect, or refuse to perform any duty enjoined upon it by this part; or shall fail, omit, neglect or refuse to obey, observe, and comply with any regulation or final direction, requirement, determination or order made by the [PUC] … such public utility, person or corporation for such violation, omission, failure, neglect, or refusal, shall forfeit and pay to the Commonwealth a sum not exceeding $1,000, to be recovered by an action of assumpsit instituted in the name of the Commonwealth. In construing and enforcing the provisions of this section, the violation, omission, failure, neglect, or refusal of any officer, agent, or employee acting for, or employed by, any such public utility, person or corporation shall, in every case be deemed to be the violation, omission, failure, neglect, or refusal of such public utility, person or corporation.
>
> **(b) Continuing offenses.**--Each and every day's continuance in the violation of any regulation or final direction, requirement, determination, or order of the [PUC] … or of any final judgment, order or decree made by any court, shall be a separate and distinct offense. If any interlocutory order of supersedeas, or a preliminary

47

injunction be granted, no penalties, shall be incurred or collected for or on account of any act, matter, or thing done in violation of such final direction, requirement, determination, order, or decree, so superseded or enjoined for the period of time such order of supersedeas or injunction is in force.

66 Pa. C.S. §3301(a), (b).

As set forth above, the pertinent PUC regulation states: "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement." 52 Pa. Code §54.4(a) (emphasis added). HIKO challenges the PUC's interpretation of this regulation. As set forth above, however, the PUC's interpretation of its own regulations is entitled to great deference and will not be reversed unless clearly erroneous. Lyft.

Here, the PUC rejected HIKO's proffered interpretation of 52 Pa. Code §54.4(a), explaining (with emphasis added):

> Although HIKO argues that Section 54.4(a) 'does not state that each EGS invoice must conform to the marketed price' but rather contains a 'general' statement that '**prices billed** must reflect the marketed price and the agreed upon prices in the disclosure statement' we find that distinction to be one without a difference. HIKO [Exceptions] at 12 (emphasis in original). The prices in HIKO's invoices did not match the customer information[15] provided, which guaranteed savings of between 1% and 7%. We find no basis to adopt an analysis that Section 54.4(a) demands anything more

_____

[15] As the PUC noted in its opinion, its regulations define the term "Customer information" as "[w]ritten, oral or electronic communications used by electricity providers [(which expressly includes EGSs)] to communicate to consumers prices and terms of service." 52 Pa. Code §54.2.

48

> than disparate pricing in order for us to adopt the ALJs'
> conclusion that HIKO billed prices that did not match its
> customer information.

Commission Op. at 25-26. We do not believe the PUC's interpretation of the plain language of Section 54.4(a) of its regulations is clearly erroneous; thus, we may not disturb it.

Further, the record supports the PUC's determination that HIKO violated Section 54.4(a) by charging its customers amounts that exceeded HIKO's marketed prices and the agreed upon prices in HIKO's disclosure statement. The ALJs determined each overcharge equated to a violation of Section 54.4(a) of the PUC's regulations. ALJs' Initial Dec. at 31. HIKO marketed and agreed to a discount of 1% to 7% off the customer's EDC's PTC through its disclosure statement and welcome letter. Id. HIKO issued a disclosure statement to each customer who enrolled in its price offering, which stated that the rate is the "price stated at sign-up and confirmed in your written Welcome Letter from HIKO." Id. at 32 (citing C.R., I&E Ex. 4; N.T. 143-44). HIKO's Welcome Letter to customers enrolled in its price offering stated:

> **Guaranteed Savings!** You have been enrolled onto a variable rate, which is guaranteed to be 1-7% less than your local Utility's price to compare, for the first six monthly billing cycles. After the six-month introductory rate plan, you will be automatically rolled over onto a competitive variable rate, which will be determined by [HIKO], based on numerous key factors, including current market conditions and climate. The variable rate can change regularly.

Id. (quoting C.R., I&E Ex. 3) (emphasis in original).

49

HIKO did not dispute that it failed to honor the guaranteed discounted rate during the winter of 2014. Id. (citing C.R., HIKO St. 1-R at 9; C.R., HIKO St. 2-R at 33-34, 39, 49, 59; N.T. at 164-66, 191, 193, 195, 197). In particular, HIKO admitted that from January through April 2014, it billed a large number of its customers in the service territories of Duquesne Light, Met-Ed, PECO, Penelec, PPL and West Penn a unit rate for electricity supply during the customers' introductory periods that exceeded, and sometimes far exceeded, the discounted introductory rate guaranteed at the time of each customer's enrollment as a HIKO supply customer. Id.

The ALJs explained that I&E Exhibits 6A through 11A showed the number of violations. Further, HIKO's CEO, Klein, confirmed the spreadsheets were true and correct business records representing billing data for HIKO customers of this price guarantee from January through April 2014 in each EDC service territory. N.T. at 147. Klein testified each row of data set forth in the spreadsheets represented a single invoice entry. N.T. 148. Klein confirmed the meaning of each column heading. N.T. at 148-51. Klein confirmed the process for determining whether an invoice entry was deemed an overcharge under the terms of the price offering. N.T. at 151-54.

Further, the ALJs credited the testimony of I&E witness Mumford that the spreadsheets show 14,689 occurrences of HIKO's overcharging over 99% of the PTC of the EDC in six EDC territories. ALJs' Initial Dec. at 33; N.T. at 49. The ALJs also found persuasive Mumford's testimony that each overcharge was a reasonable way of defining an "instance." Id. at 34 (citing N.T. at 38-39, 136-37).

50

The ALJs explained that the record revealed 14,689 overcharges. Id. at 35. Contrary to Dr. Cicchetti's claim that I&E's penalty assessment was exaggerated "for what was essentially a single business decision," the ALJs stated, violations of Section 54.4(a) are not based on the number of business decisions, but rather, the number of overcharges. Id. (citing C.R., HIKO St. 2 at 49). On each occasion, HIKO submitted a bill for a charge that was contrary to what it promised. Id. (citing N.T. at 87-88).

Further, as the ALJs recognized, the imposition of a civil penalty for each overcharge is lawful and appropriate in light of the fact that each overcharge can be feasibly segregated into a discrete violation. See Newcomer Trucking, Inc. v. Pa. Pub. Util. Comm'n, 531 A.2d 85, 87 (Pa. Cmwlth. 1987) ("[I]t becomes obvious that Section 3301(a) of the [Public Utility] Code permits the PUC to impose a fine of up to $1,000 for each and every discrete violation of the [Public Utility] Code or PUC regulation, regardless of the number of violations that occur.").

In Newcomer, the PUC determined that a trucking company, Newcomer Trucking, Inc. (Newcomer), violated a PUC regulation 184 times on 128 separate days by transporting the goods of more than one consignor on one truck at the same time. The PUC imposed a penalty per regulatory violation. In rejecting Newcomer's challenges to the PUC's penalty calculation, this Court explained:

> First, Newcomer contends that [Section 3301 of the Public Utility Code] limits to $1,000 the amount of the penalty the PUC can impose upon a violator of any single

Code provision regardless of the number of violations committed. Thus, Newcomer asserts that, even though it had violated 52 Pa.Code § 31.24 a total of 184 times on 128 separate days, the total fine that the PUC could assess was $1,000. We are compelled to disagree with this strained and unreasonable interpretation.

As our research has uncovered no case law interpreting [Section 3301 of the Public Utility Code], we must turn to the Statutory Construction Act of 1972 (Act), 1 Pa. C.S. §§ 1501-1991, for guidance. Two sections of the Act are particularly instructive here. Under Section 1922, a statute is to be interpreted so as to avoid an absurd or unreasonable result. 1 Pa. C.S. § 1922(1). Interpreting Section 3301(a) of the Code in the fashion proposed by Newcomer, however, would be both absurd and unreasonable. Under Newcomer's argument, no matter how many times a Code provision or PUC regulation is violated, be it once or 100 times, the maximum penalty that the PUC could levy would be $1,000. Clearly, this could not have been the intent of the legislature, and we decline to so find.

Moreover, Section 1930 of the Act states: "Whenever a penalty or forfeiture is provided for the violation of a statute, such penalty or forfeiture shall be construed to be for each such violation." 1 Pa. C.S. § 1930. When this section is read in conjunction with Section 1922(1) of the Act, it becomes obvious that Section 3301(a) of the Code permits the PUC to impose a fine of up to $1,000 for each and every discrete violation of the Code or PUC regulation, regardless of the number of violations that occur.

Alternatively, however, Newcomer argues that even if the PUC can impose a penalty in excess of $1,000, subsection (b) of Section 3301 of the Code requires the PUC to impose the monetary penalty on a per day, not per violation, basis. Thus, according to Newcomer, since the violation here occurred on 128 separate days, it should have been fined only $12,800.

52

While again, no cases have interpreted [Section 3301(b) of the Public Utility Code], cases citing its virtually identical predecessor, Section 1301(b) of the Public Utility Law,[16] are instructive. See 1 Pa. C.S. § 1922(4) ("[w]hen a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language").

In York Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission, [121 A.2d 605 (Pa. Super. 1956)], the court affirmed a PUC order fining a public utility $50 per day for the 655 days it failed to comply with an earlier PUC order to acquire additional manpower to improve its service. In so doing, the court recognized that 'continuing offenses' are not simply offenses repeated on more than one day; rather, 'continuing offenses' are proscribed activities that are of an ongoing nature and cannot be feasibly segregated into discrete violations so as to impose separate penalties. [121 A.2d at 617] (Rhoades, P.J., concurring and dissenting); see also Gornish v. Pennsylvania Public Utility Commission, [4 A.2d 569 (Pa. Super. 1939)].

In the case at bar, however, although the proscribed shipments occurred on 128 separate days, 184 separate shipments were identified. Each shipment constituted a separate violation of 52 Pa. Code § 31.24, and thus the PUC acted within its power under Section 3301 when it assessed a penalty for each violation.

Newcomer, 531 A.2d at 86-88 (emphasis added).

Similar to Newcomer, the record here reveals HIKO overcharged its customers on 14,689 invoices during the four-month period at issue. Each invoice constituted a separate violation of 52 Pa. Code §54.4(a); thus, the PUC acted

---

[16] Act of May 28, 1937, P.L. 1053, as amended, 66 P.S. §1491(b). Section 1301 was repealed by Section 2 of the Act of July 1, 1978, P.L. 598.

within its authority under Section 3301 of the Public Utility Code in assessing a penalty for each violation. Further, as indicated in the above-quoted excerpt from Newcomer, we specifically rejected the argument HIKO advances here, that the PUC was required to calculate the penalty under Section 3301(b) of the Public Utility Code on a per day rather than per violation basis.

In addition, although HIKO relies on the opinion of its expert, Dr. Cicchetti, that 300 invoice entries were likely not billed to customers, the PUC and ALJs expressly rejected this testimony, explaining: "[Dr.] Cicchetti was unspecific about which line items were incorrectly included in the calculations. He also seemed unsure whether the customer was billed the re-bill or not. As his testimony contains conjecture, we find I&E carried its burden of proving 14,689 violations did occur during the four month period in question." Commission Op. at 32 (quoting ALJs' Initial Dec. at 31). As set forth in greater detail below, the record supports the PUC's finding on this point.

In sum, the record supports the finding of the PUC and ALJs that HIKO charged its customers at rates in excess of its marketed prices and the agreed upon prices in its disclosure statement on 14,689 invoices. Further, the PUC and ALJs properly determined each overcharge constituted a separate violation of 52 Pa. Code §54.4(a). Newcomer.

### D. Substantial Evidence
### 1. Contentions

As a final issue, HIKO maintains the PUC erred in sustaining a civil penalty that lacks substantial record support. HIKO argues the PUC adopted the

same penalty amount the ALJs recommended even though the PUC admitted the ALJs made factual mistakes that led them to weigh some of the required penalty factors against HIKO. In so doing, HIKO asserts, the PUC erred.

HIKO contends the PUC was free to wholly disregard and supersede the ALJs' findings, especially where the recommended civil penalty was not supported by substantial evidence. See, e.g., City of Phila. v. Pa. Pub. Util. Comm'n, 458 A.2d 1026 (Pa. Cmwlth. 1983). HIKO argues where the relief granted is a civil penalty for violations of PUC regulations, the PUC's civil penalty determination must be supported by evidence presented on each of the 10 factors in the penalty policy. See Rosi v. Bell Atl.-Pa, Inc. & Sprint Commc'ns, L.P., No. C-0092409 (Mar. 16, 2000), 2000 WL 1407936 (Pa.P.U.C.). HIKO asserts that, in assigning proper weight to each of the penalty factors, the PUC should have, at a minimum, reduced the civil penalty to reflect the shortcomings it found in the ALJs' findings, as well as the uncertainties inherent in applying a "per invoice" method of computing an appropriate civil penalty.

HIKO contends the PUC expressly acknowledged that the ALJs relied on insufficient evidence to support certain conclusions as to the required penalty factors. First, the PUC conceded the ALJs' conclusion that customers suffered financial hardship as a result of the overcharges was "lacking on this record." Commission Op. at 48. HIKO asserts the ALJs drew this conclusion despite the fact that I&E did not present any such evidence at the hearing. HIKO argues the evidence it presented supported the opposite conclusion as nearly two-thirds of the customer overcharges were less than $100. Moreover, HIKO agreed to make full

55

restitution to all affected customers in its settlement of the OAG/OCA case. HIKO asserts the ALJs' improper conclusion of financial hardship prejudiced HIKO by more heavily weighting the "seriousness of the violation" element of the penalty policy, 52 Pa. Code §69.1201(c)(2), against HIKO. Nevertheless, HIKO maintains, the PUC did not reduce the ALJs' recommended civil penalty.

Next, HIKO asserts, the PUC admitted that the ALJs' conclusion that HIKO did not comply with the PUC's surety requirements was "unclear at best," and the PUC was "unable to reach any conclusion on this point." Commission Op. at 49. Again, HIKO argues, although the ALJs weighted the "compliance history" penalty factor, see 52 Pa. Code §69.1201(c)(6), against HIKO, it did not adjust the recommended penalty amount.

In addition, HIKO contends, the PUC conceded there was "insufficient evidence" to support the ALJs' analysis that a nearly $2 million civil penalty was proper given HIKO's size. Commission Op. at 52. At the hearing, HIKO asserts, I&E produced no evidence as to HIKO's size, see 52 Pa. Code §69.1201(c)(8), to show the enormous civil penalty was warranted to deter HIKO or could even be borne by the company. Again, HIKO asserts, the PUC refused to depart from the civil penalty recommended by the ALJs, saying only, "it placed little emphasis on [the] value" of the evidence as to HIKO's size. Commission Op. at 52.

HIKO argues that, having admitted the ALJs improperly drew conclusions that weighed each of those penalty factors against HIKO, the PUC

should have at the very least reduced the penalty. Yet, HIKO asserts the PUC approved the exact same amount the ALJs recommended, without modification. In the PUC's view, none of these evidentiary shortcomings "[rose] to such a level as to persuade [it] that the proposed civil penalty [was] inappropriate or unsupported." Commission Op. at 43. HIKO contends that such a vague basis for ignoring crucial deficiencies in the initial decision is contrary to constitutional law. In the context of regulatory penalties, the Due Process Clauses of the U.S. and Pennsylvania Constitutions mandate that a party have reasonable notice of the penalty that may accrue for a violation, as well as the underlying basis on which it rests. See S. Union Twp. v. Dep't of Envtl. Prot., 839 A.2d 1179, 1192 (Pa. Cmwlth. 2003); see also Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926).

Effectively conceding substantial evidence was lacking on 3 of the 10 required elements of the penalty policy, HIKO argues, the PUC was required to re-calibrate the civil penalty the ALJs computed. Had it done so, in light of the PUC decisions approving settlements in other relevant cases, see 52 Pa. Code §69.1201(c)(9), HIKO asserts, it could not have upheld the $1,836,125 penalty.

HIKO also reiterates its argument that the PUC used an improper method for computing the number of violations. It asserts the PUC affirmed the ALJs' finding that HIKO billed its customers 14,689 times in amounts that exceeded the price guarantee and that each billing constituted a separate violation of Section 54.4(a). Yet, in the same breath, the PUC acknowledged the inherent inconsistencies and uncertainties of the underlying data that this "per invoice" computation relied on.

HIKO asserts that, in affirming the ALJs' penalty determination, the PUC again disregarded these deficiencies, reasoning: "HIKO had the opportunity to correct mistakes in I&E's calculation" and ultimately "fail[ed] to carry its burden of persuasion once [I&E's] burden shifted from I&E to [HIKO]." Commission Op. at 33. HIKO argues this explanation ignores basic principles of burden of proof and burden-shifting. It maintains, there is no dispute that I&E had the burden of proving Section 54.4(a) was violated on 14,689 separate occasions. HIKO contends I&E's burden also required it to eliminate confusion about the meaning of its proofs and to establish any seemingly anomalous entries were, in fact, invoices actually billed to customers. To do that, HIKO asserts, I&E could have served written discovery to establish what the entries meant. HIKO argues I&E could have obtained the actual customer invoices to confirm whether the customer was actually billed the invoice amount or presented customer testimony. But, I&E elected to do none of these things.

HIKO contends that where I&E's exhibits are inconsistent, misleading or unreliable, I&E does not to carry its burden. HIKO argues it should not incur greater penalties because of that failure. Because I&E did not offer any evidence proving these partial, duplicative or corrected invoice entries actually amounted to violations of the PUC's regulations, HIKO argues, I&E did not meet its burden of proving HIKO violated Section 54.4(a) on 14,689 separate occasions.

In addition, HIKO contends, the total number of violations the PUC accepted includes hundreds of other anomalous and questionable invoices that

58

should not have been considered violations of Section 54.4(a) because they involved *de minimis* amounts.

HIKO also asserts Dr. Cicchetti testified that at least 118 of the invoices (0.8%) included in I&E's computation contained overcharges of less than $1 and 1,293 of the invoices (8.8%) were less than $10. And, HIKO argues, the ALJs credited this testimony. Yet, the PUC approved a civil penalty computation that included a substantial penalty for each of these overcharges. HIKO contends this is overly punitive. See Bristol-Myers Co. v. Lit Bros., Inc., 6 A.2d 843, 848 (Pa. 1939) ("[T]he court is not bound to a strictness at once harsh and pedantic in the application of statutes ... Where there are irregularities of very slight consequence, it does not intend that the infliction of penalties should be inflexibly severe."). Therefore, HIKO maintains, the PUC should have entirely removed or significantly discounted these invoice entries in the penalty calculation.

HIKO argues that a "per customer" methodology would recognize a violation for each of the 5,708 affected HIKO customers at the average $124 customer overcharge and result in a far lower but still substantial penalty of $707,792. It asserts such a penalty would be many times higher than any other civil penalty the PUC approved against another EGS, and much higher than virtually all the civil penalties approved in settlements for EDCs for gas explosions that caused serious physical injuries and property damage. HIKO contends the PUC's prior penalty decisions regarding similar claims comport with a "per customer" method for violations of Section 54.4(a). See Herp. HIKO maintains the PUC did not address its decision in Herp here.

## 2. Analysis

We reject HIKO's various assertions on this issue. At the outset, we note, HIKO does not dispute the PUC's determinations as to several of the penalty policy factors. In particular, HIKO does not dispute that: (a) under the first penalty factor, its conduct was of a serious nature, which "may warrant a higher penalty," 52 Pa. Code §69.1201(c)(1); (b) under the third penalty factor, its conduct was intentional, which "may result in a higher penalty," see 52 Pa. Code §69.1201(c)(3); (c) under the fifth penalty factor, its conduct involved a large number of customers (more than 5,700) over the course of a four-month period; and, (d) under the sixth penalty factor, all of the violations here occurred while HIKO's Pennsylvania EGS license was still in conditional status.

Nevertheless, HIKO first asserts that, in light of the PUC's concession that the record lacked substantial evidence that HIKO's customers suffered financial hardship, the PUC was obligated to reduce the civil penalty. The ALJs mentioned this point in the context of their analysis of the second penalty factor, which involves consideration of: "Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or property damage, the consequences may warrant a higher penalty." See 52 Pa. Code §69.1201(c)(2). With regard to the second factor, the ALJs stated:

> HIKO's argument that since the allegations do not involve the consequences of death, personal injury, or property damage, no or a low penalty is warranted. As an example, HIKO cites as authority for its position, [UGI Penn Natural Gas], wherein after repeated violations of gas safety regulations spanning the course of nearly five years, with consequences that included

60

many deaths and substantial property damage, the largest civil penalty imposed on UGI Utilities, Inc. ('UGI') was only $1,000,000. It is difficult to compare settled outcomes involving natural gas explosions with the instant case. We have no way of knowing whether the violations alleged in the UGI cases would have been proven by a preponderance of the evidence. …

Focusing on the instant case, it would be unreasonable given the magnitude of the number of overcharges in violation of 52 [Pa. Code] § 54.4(a) to not direct any penalty at all. Further, it is unknown the hardship the approximately 5,700 customers experienced, even if their average monthly overcharge was only $124. If the EGS's [PTC] rate increased by 400% without prior notice and without the expectation for the occurrence, <u>we infer that there was some financial hardship experienced by the customers and, therefore, the consequences of HIKO's actions were of a serious nature</u>. [C.R.,] I&E St. 1 at 49. We accept as credible Dr. Cicchetti's testimony that some of the overcharges were for less than a dollar. N.T. [at] 211. This fact and the fact that the conduct complained of is not 'slamming' may warrant less than the maximum penalty per occurrence; however, the conduct is serious as evidenced by the number of informal complaints BCS received regarding the company, the number of total violations as depicted in Appendix C to I&E's Main Brief, and the number of customers that cancelled their agreements with HIKO from January – April, 2014.

ALJs' Initial Dec. at 39-40 (emphasis added). While the PUC declined to uphold the ALJs' inference regarding customer hardship, it nevertheless recognized that the $125 per violation penalty levied by the ALJs was appropriate because it approximated HIKO's average overcharge on customer invoices during the four-month period at issue, which was $124. Commission Op. at 48. The PUC also indicated that consumer testimony admitted in connection with the OAG/OCA case addressed the issue of customer hardship. Id.

Regardless, the PUC determined its decision not to adopt the ALJs' inference regarding financial hardship to HIKO's customers did not warrant an adjustment to the penalty amount arrived at by the ALJs. Id. This is not surprising given the PUC's determinations regarding the magnitude of HIKO's continuous, intentional violations of PUC regulations here.

Indeed, the PUC clearly believed that the consequences of HIKO's widespread and prolonged overcharging of its customers in direct infringement of its price guarantee and PUC regulations were serious. As I&E's witness Mumford explained during his direct testimony, "[w]hen customers shop in the retail electric marketplace, they need to be able to trust that the rates that are marketed and promised at the time of enrollment are the rates that will be charged for electric generation. Otherwise, retail electric competition will not be successful." C.R., I&E Statement No. 1 at 49. To that end, the PUC explained that HIKO "knowingly and deliberately" chose to dishonor its promised and contracted-for savings of 1% to 7% on 14,689 occasions to 5,708 customers, in direct violation of Section 54.4(a) of the PUC's regulations. Commission Op. at 44. In so doing, the PUC determined, HIKO effectively treated its own customers as the financial guarantors of its own business plan, which backed contracts offering customers guaranteed savings with what was essentially a speculative supply portfolio based exclusively on spot market purchases. Id. Thus, although this case did not involve personal injury or property damage, the PUC clearly considered HIKO's recurring regulatory violations to have serious consequences.

As further support for its argument that the PUC should have reduced the penalty, HIKO points to the PUC's determination that it was unable to clearly determine whether HIKO complied with the PUC's surety or bond requirements. Although HIKO correctly points out that the PUC stated that evidence of HIKO's compliance with the PUC's surety requirements was "unclear at best," Commission Op. at 49, we disagree with HIKO that this fact required the PUC to reduce the penalty imposed against HIKO.

To that end, the ALJs addressed the surety issue in their discussion of the sixth penalty policy factor, which concerns "[t]he compliance history of the regulated entity which committed the violation. An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty." 52 Pa. Code §69.1201(c)(6). With regard to HIKO's compliance history, as set forth in greater detail above, HIKO's 14,689 violations of Section 54.4(a) of the PUC's regulations, which involved 5,708 customers over the course of a four-month period, all occurred during the period HIKO's EGS license was in conditional, probationary status in which the PUC had placed conditions on HIKO's sales and marketing practices. In light of the fact that HIKO's widespread, repeated violations here occurred while its EGS license remained in conditional status, in evaluating the "history of compliance" penalty policy factor, the PUC stated, "at the time of the January through April 2014 violations, HIKO was still operating in a 'probationary' period of its licensure." Commission Op. at 52.

Next, as to HIKO's argument regarding the lack of record evidence as to its size, as explained above, the PUC's eighth penalty policy factor states: "The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount." 52 Pa. Code §69.1201(c)(8) (emphasis added). Here, the PUC clearly considered this factor. Commission Op. at 52. However, it declined to place much weight on the ALJs' analysis of HIKO's size. Regardless, the PUC found ample support for the remainder of the ALJs' analysis to adopt the recommended civil penalty. Additionally, as the ALJs recognized, the total amount of the civil penalty closely reflects the actual, total overcharge HIKO billed its customers. ALJs' Initial Dec. at 49. As discussed throughout this opinion, the record amply supports the PUC's decision regarding its imposition of the civil penalty.

Finally, as to HIKO's argument that the PUC erred in utilizing a "per invoice" method of computing the civil penalty, the PUC, adopting the ALJs' reasoning, explained, in pertinent part:

> HIKO made 14,689 separate and distinct overcharges to 5,708 Pennsylvania customer accounts from January through April 2014. Based on the invoice entries set forth in I&E Exhibits 6A through 11A, and as summarized in I&E Exhibit 14, the evidence shows a total of 14,689 overcharges disaggregated as follows: 264 in Duquesne Light service territory, 1,624 in Met-Ed service territory, 1,599 in PECO service territory, 1,782 in Penelec service territory, 8,018 in PPL service territory and 1,402 in West Penn service territory. …
>
> In Exhibits 6A, 7A, 9A, 10A and 11A, the number of violations appears to be accurately highlighted. Where there is a re-bill in these exhibits, it is clearly marked 'Rebilled Energy Charge' and these charges do not

appear to be highlighted or included in the total number of violations, i.e. Exhibit 7A, at 1. However the PECO exhibit does not have any line-itemed re-bill charges expressly stating such. [Dr.] Cicchetti testified as follows:

> There were a lot of overcharges where, if you look at the data, there were probably at least 300 instances where it was one of these bills dated one day, and then two days later it was modified and it was another bill. And I'm not sure the customer even saw that. It may have just been between HIKO and the utility.

*[Dr.] Cicchetti was unspecific about which line items were incorrectly included in the calculations. He also seemed unsure whether the customer was billed the re-bill or not. As his testimony contains conjecture, we find I&E carried its burden of proving 14,689 violations did occur during the four month period in question.*

\* \* \* \*

HIKO does not dispute that it failed to honor the guaranteed discounted rate during the winter of 2014. HIKO admits that from January 2014 through April 2014, HIKO billed a large number of customers within the service territories of Duquesne Light, Met-Ed, PECO, Penelec, PPL and West Penn a unit rate for electricity supply during the customers' introductory periods that exceeded, and sometimes far exceeded, the discounted introductory rate that was guaranteed at the time of each customer's enrollment as a HIKO supply customer.

I&E Exhibits 6A through 11A show the highlighted number of violations. HIKO's witness, [Klein], confirmed that the spreadsheets were true and correct business records representing billing data for HIKO customers of this price guarantee for January through April 2014 in each EDC service territory. [Klein] testified that each row of data set forth in the spreadsheets represents a single invoice entry. [Klein] confirmed the meaning of each column heading. [Klein]

65

confirmed the process for determining whether an invoice entry was deemed to be an overcharge under the terms of the [p]rice [o]ffering.

The testimony of I&E's witness [Mumford], Manager of the Informal Compliance and Competition Unit of BCS, is persuasive and supports a finding that these spreadsheets show 14,689 occurrences of HIKO's overbilling over 99% of the price to compare rate of the EDC in six EDCs' territories. Although we note that in the PECO Exhibit 8A there are approximately 60 highlighted charges that appear to involve thirty double billings (the same account number, the same time period, and different usage amounts and billed amounts), since the line items are labeled Energy Charge instead of Rebilled, we are willing to accept these also as violations of 52 Pa. Code [§]54.4(a).

Commission Op. at 30-32 (quoting ALJs' Initial Dec. at 30-33) (emphasis in original). The record supports the PUC's necessary determinations. See N.T. at 38-39, 49, 146-154, 210-11, C.R., I&E Exs. 6A-11A, I&E St. No. 1 at 16-45; see also R.R. at 818a-19a.

Further, as the PUC explained, HIKO had the opportunity to correct mistakes in I&E's calculation. However, Klein, HIKO's CEO and President, confirmed that the data presented in I&E's exhibits were "true and correct business records representing billing data for HIKO customers of this price guarantee for January through April 2014 in each EDC service territory[.]" Id. at 32 (quoting ALJs' Initial Dec. at 32-33). Additionally, HIKO presented no clear evidence of any errors that would impact the outcome. Id. While HIKO offered the testimony of Dr. Cicchetti, an independent consultant, Dr. Cicchetti testified that the entries HIKO disputed "likely represented" contested billing that was later corrected or

66

replaced, and the ALJs rejected this testimony as conjecture.  Id. at 33 (citing HIKO Exceptions at 16).

In short, as the PUC explained, I&E presented evidence of HIKO's billing invoices utilizing data that HIKO provided, and HIKO did not present any clear evidence to refute that evidence.  Id.

In addition, based on their analysis of the penalty policy factors, the ALJs determined that the average amount of HIKO's overcharge mitigated in favor of less than the maximum $1,000 per violation penalty authorized under Section 3301(a) of the Public Utility Code.  Thus, the ALJs arrived at a per violation penalty of $125, which closely resembled HIKO's average monthly overcharge of $124, and only 12.5% of the maximum per violation penalty I&E requested.

Further, contrary to HIKO's argument, the PUC *did* consider the fact that some of the overcharges were relatively small.  However, the PUC explained that there was no "*de minimis*" exception contained in its regulations requiring it to ignore violations "likely" affecting seasonal homeowners or, as I&E asserted, rendering them irrelevant to a determination of whether a violation occurred. Commission Op. at 34.

Finally, Herp, relied on by HIKO, is distinguishable.  Herp involved the complaint of a single customer (rather than an investigation by I&E) regarding a misleading statement about an EGS' rates made by a third-party marketing agent for the EGS during a door-to-door solicitation.

67

Here, unlike in <u>Herp</u>, the fact-finder determined that HIKO's highest-level executives made the decision to intentionally overcharge approximately 5,708 customers on nearly 15,000 invoices in a manner contrary to the clear language of its welcome letter and disclosure statement. Thus, the intentional misconduct by HIKO's top management, combined with the sheer magnitude of the violations, separates this case from <u>Herp</u>.

## IV. Conclusion

For all the foregoing reasons, we affirm.

ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

HIKO Energy, LLC, :
           Petitioner :
            :
          v. : No. 5 C.D. 2016
            : Argued: December 14, 2016
Pennsylvania Public Utility :
Commission, :
          Respondent :

# **O R D E R**

     **AND NOW**, this 8th day of June, 2017, the order of the Pennsylvania Public Utility Commission is **AFFIRMED**.


<br>

                                 _____
                                 ROBERT SIMPSON, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIKO Energy, LLC, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 5 C.D. 2016 |
| | : | Argued: December 14, 2016 |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE ROBERT SIMPSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE JULIA K. HEARTHWAY, Judge

DISSENTING OPINION
BY PRESIDENT JUDGE LEAVITT                    FILED: June 8, 2017

The Pennsylvania Public Utility Commission (PUC) has imposed a civil penalty of $1,836,125 upon HIKO Energy, LLC (HIKO), an electric generation supplier (EGS), because its invoices to 5,708 customers over a four-month period "did not reflect the marketed prices and agreed upon prices in the disclosure statement." 52 Pa. Code §54.4(a). This civil penalty, the highest in the history of utility regulation in Pennsylvania when ordered, is grossly disproportionate to the penalties of $25,000 to $125,000 imposed upon other EGSs for the same conduct during the same time period. A grossly disproportionate civil penalty violates the PUC's Statement of Policy for calculating civil penalties and the constitutional prohibition against excessive fines. Because the PUC erred and abused its discretion, I respectfully dissent from the majority's decision to affirm the PUC.

HIKO has its principal place of business in New York. In December of 2012, the PUC granted HIKO a license to supply electric generation services in Pennsylvania to residential, small commercial, large commercial, industrial, and governmental customers in the service territories of various electric distribution companies (EDC). The license was granted on condition of an 18-month probationary period, from December 2012 through June 2014, and shortly thereafter HIKO began providing service in Pennsylvania. HIKO purchased electrical energy on the spot market and then sold it to retail customers. It developed its customer list by door-to-door, telephone, and website solicitation. HIKO delivered electric service through utilities local to its customers.

In August 2013, HIKO began to offer a six-month introductory price, which guaranteed that the customer's cost for electricity would be at least one to seven percent less than the price-to-compare (PTC) of the customer's local utility. Thereafter, customers would be enrolled in HIKO's variable rate program whereby prices would be determined by market conditions and climate. HIKO confirmed the introductory price offer in a "Welcome Letter and Disclosure Statement" issued to customers that accepted this offer.[1]

In January 2014, wholesale market prices for electrical energy increased dramatically. A period of sustained cold weather, referred to as a "polar vortex," caused a surge in the use of electricity in Pennsylvania. At the same time,

---

[1] HIKO's welcome letter stated that the rate "is guaranteed to be 1-7% less than [the] local Utility's price to compare, for the first six months billing cycles. After the six-month introductory rate plan, [customers] will be automatically rolled over onto a competitive variable rate, which will be determined by HIKO Energy, based on numerous key factors, including current market conditions and climate." ALJ Decision at 15, Finding of Fact No. 45. The Disclosure Statement provided that the rate is the "price stated at sign-up and confirmed in [customers'] written Welcome Letter from HIKO." ALJ Decision at 15, Finding of Fact No. 46.

an increase in natural gas prices in Canada increased the costs of electrical generating plants. Prior to the polar vortex, PJM Interconnection LLC[2] (PJM) sold electricity to HIKO at approximately $0.08 per kWh. In January 2014, the price increased approximately 300% to $0.227 per kWh, and the price remained at or above $0.138 per kWh until April 2014. As a result, HIKO was able to secure electrical power only at exorbitant rates during this period.

Consistent with its variable rate program, HIKO passed its unexpected costs along to its customers. This decision included the 5,708 customers enrolled in HIKO's introductory price discount program. During the first four months of 2014, those 5,708 customers were billed in the aggregate $3.29 million. Of that total, approximately $1.8 million represented charges in excess of the introductory price discount. HIKO charged customers as much as $0.29 per kWh, or up to 400% of the PTC of the local utility. The average aggregate overcharge for each HIKO customer in the introductory price discount program was $124. ALJ Decision at 13; Finding of Fact No. 29.

Customers complained to HIKO. In response, beginning in February 2014, HIKO made refunds that totalled $159,320.15. It also stopped offering the six-month introductory price discount.

Customers also complained to the PUC's Bureau of Consumer Services, which referred the matter for an investigation. In response to the PUC's investigation, HIKO provided all requested information, which included a spreadsheet of 14,689 invoice entries for the first four months of 2014. That

---

[2] PJM is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia.

included invoices issued above the introductory discounted rate as well as invoices that were duplicate "re-bills." ALJ Decision at 18, Finding of Fact No. 69.

Based on the information provided by HIKO, the PUC's Bureau of Investigation and Enforcement (I&E) filed a complaint, alleging that each of HIKO's 14,689 invoices constituted a separate violation of the PUC's regulation, which requires an EGS to bill at the "agreed upon price stated in the disclosure statement." 52 Pa. Code §54.4(a).[3] The complaint requested a civil penalty of $14,689,000, or $1,000 for each alleged violation. HIKO filed an answer with new matter, asserting, *inter alia*, that the requested penalty was grossly disproportionate. HIKO Answer, New Matter ¶11; Reproduced Record at 83a (R.R. ___). The PUC appointed Elizabeth H. Barnes and Joel H. Cheskis to serve as Administrative Law Judges to hear evidence in the case and recommend a decision.

In the meantime, the Office of Attorney General, by its Bureau of Consumer Protection and its Office of Consumer Advocate (collectively, Attorney General), filed a complaint with the PUC, accusing HIKO of misleading marketing and improper billing. The PUC appointed ALJ Barnes and ALJ Cheskis to conduct a hearing on the Attorney General's complaint. HIKO sought to consolidate the two proceedings, but the ALJs denied its request.

The Attorney General and HIKO settled their litigation. HIKO agreed to pay $2,025,383.85 into a refund pool, in addition to the refund of $159,320.15 it

---

[3] This regulation states:

> (a) EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement.

52 Pa. Code §54.4(a).

had already made to affected customers. HIKO agreed to give customers that had enrolled in HIKO's introductory discount program a refund that gave them the benefit of their bargain.[4] HIKO further agreed to cease accepting new customers until June 30, 2016; to pay up to $50,000 for the costs and expenses related to administering the refund pool; and to contribute $25,000 to the local EDC hardship funds. The parties submitted the settlement to the ALJs for review, and on August 21, 2015, the ALJs approved the settlement between the Attorney General and HIKO.

The very same day, the ALJs issued a decision in I&E's enforcement action against HIKO and ordered a civil penalty of $1,836,125. In so doing, the ALJs referred to the PUC's Statement of Policy on civil penalties, which states:

> (a) The [PUC] will consider specific factors and standards in evaluating litigated and settled cases involving violations of 66 Pa. C.S. (relating to Public Utility Code) and this title. These factors and standards will be utilized by the [PUC] in determining if a fine for violating a [PUC] order, regulation or statute is appropriate, as well as if a proposed settlement for a violation is reasonable and approval of the settlement agreement is in the public interest.

> (b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. *When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding.* The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as

---

[4] During the first four months of 2014, HIKO lost 70 percent of its customers in Pennsylvania; 80 percent of those were in the guaranteed discount program. In large part, this was attributed to HIKO's decision to stop marketing in January 2014. Some customers left the state or switched utilities. The refund pool was created to pay the administrative expenses associated with locating the customers entitled to a refund as well as paying for the refunds themselves. According to HIKO's expert, Charles Cicchetti, a number of the overcharges "were less than a dollar. Quite a few under $10." R.R. 577a.

the settlement is in the public interest. The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.

(c) The factors and standards that will be considered by the [PUC] include the following:

(1) Whether the conduct at issue was of a serious nature. When conduct of a serious nature is involved, such as willful fraud or misrepresentation, the conduct may warrant a higher penalty. When the conduct is less egregious, such as administrative filing or technical errors, it may warrant a lower penalty.

(2) Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or property damage, the consequences may warrant a higher penalty.

(3) Whether the conduct at issue was deemed intentional or negligent. This factor may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty.

(4) Whether the regulated entity made efforts to modify internal practices and procedures to address the conduct at issue and prevent similar conduct in the future. These modifications may include activities such as training and improving company techniques and supervision. The amount of time it took the utility to correct the conduct once it was discovered and the involvement of top-level management in correcting the conduct may be considered.

(5) The number of customers affected and the duration of the violation.

(6) The compliance history of the regulated entity which committed the violation. An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty.

(7) Whether the regulated entity cooperated with the [PUC]'s investigation. Facts establishing bad faith, active concealment of violations, or attempts to interfere with [PUC] investigations may result in a higher penalty.

(8) The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount.

(9) Past [PUC] decisions in similar situations.

(10) Other relevant factors.

52 Pa. Code §69.1201. The ALJs addressed some, but not all, of the above-listed ten factors.

The ALJs found that HIKO made a conscious decision not to bill at the agreed upon six-month introductory price in the disclosure statement given to approximately 5,700 customers. They found the resulting "overcharges" to constitute serious violations but rejected the $14.69 million penalty proposed by I&E. The ALJs concluded that a civil penalty of $1.84 million, approximately 25% of HIKO's annual gross revenue, in addition to $160,000 in refunds and HIKO's agreement to provide an additional $1.67 million in refunds to the same customer class, constituted a "reasonable deterrence" to future violations. ALJ Decision at 50.

In reviewing past PUC decisions, the ALJs noted that there were "not many fully litigated cases specifically regarding Section 54.4(a) of the [PUC]'s

regulations." ALJ Decision at 50. The ALJs disregarded the much lower civil penalties the PUC had imposed on other EGS companies that had also overcharged their customers during the polar vortex because they were the result of settlements. The ALJs reasoned that settled cases do not have any precedential value to a litigated case.

To calculate the $1,836,125 civil penalty, the ALJs treated each spreadsheet invoice entry as a violation, for a total of 14,689 violations. The ALJs multiplied that number by $125, the aggregate average overcharge per customer. The ALJs concluded that the $1,836,125 penalty was "appropriate upon consideration of the ten factors and standards." ALJ Decision at 64, Conclusion of Law No. 12. Acknowledging that a civil penalty of this magnitude was "unprecedented," the ALJs rationalized its size by noting that the $125 per violation was far less than the $1,000 per violation penalty requested by I&E. ALJ Decision at 62.

HIKO filed exceptions with the PUC. It argued that the penalty recommended by the ALJs could not be reconciled with the PUC's Statement of Policy for calculating an appropriate civil penalty. It also argued that the ALJs erred in basing the penalty on the number of spreadsheet invoices instead of the number of customers or the number of decisions by HIKO management. It further argued that the $1,836,125 civil penalty was grossly disproportionate because it was nearly 80 times higher than the civil penalties imposed on the EGS companies that had engaged in the same conduct during the same period of time and for the same reason, *i.e.*, unexpected cost increases caused by the polar vortex. The ALJs improperly disregarded those other decisions where the penalties ranged from $25,000 to $125,000 simply because they were settled cases. HIKO was not able

to settle with I&E because it refused to consider any penalty below several million dollars.

On December 3, 2016, the PUC issued the instant adjudication denying HIKO's exceptions. The PUC observed that "HIKO effectively treated its own customers as the financial guarantors of its own business plan, which backed contracts offering customers guaranteed savings with what was essentially a speculative supply portfolio based exclusively on spot market purchases." PUC Adjudication at 44. Because the $125 per violation was comparable to HIKO's average overcharge of $124, the PUC concluded that the penalty was appropriate. The PUC held that its other decisions, where the penalty approved was reached by settlement, were entitled to little weight because HIKO had required I&E to litigate.

In its appeal to this Court, HIKO argues that the PUC imposed a grossly disproportionate penalty that violated the PUC's Statement of Policy and the excessive fines clauses of the United States and Pennsylvania Constitutions.[5] It contends that the $1,836,125 civil penalty is grossly disproportionate to the sanctions levied against other EGSs for the same, and even more egregious misconduct, that occurred at the same time period. HIKO further argues that the PUC erred in determining the number of violations on a "per invoice" basis, which was never proved by the I&E.

---

[5] Specifically, the Eighth Amendment of the U.S. Constitution provides: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Pennsylvania Constitution contains similar language. PA. CONST. art. I, §13 ("[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted").

This Court's review of PUC adjudications is governed by Section 704 of the Administrative Agency Law, which states:

> After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with the law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.

2 Pa. C.S. §704. *See Barasch v. Pennsylvania Public Utility Commission*, 493 A.2d 653, 655 (Pa. 1985). Whether an agency decision is "in accordance with law" also considers whether the agency's determination represents an abuse of discretion. *Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 735 A.2d 96, 99 (Pa. 1999). The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the agency. *In re Petition of Acchione*, 227 A.2d 816, 820 (Pa. 1967).

In support of its argument that the $1,836,125 civil penalty is grossly disproportionate, HIKO directs the Court's attention to two recent PUC decisions, *Commonwealth v. IDT Energy, Inc.*[6] and *Commonwealth v. Respond Power LLC.*[7] Those enforcement proceedings arose during the same confluence of events in 2014: abnormally cold weather attributable to the "polar vortex," record breaking use of natural gas and electricity, and a dramatic increase in wholesale market prices for electrical energy.

---

[6] PUC Docket No. C-2014-2427657, penalty approved by the PUC on June 6, 2016.

[7] PUC Docket No. C-2014-2427659 & 2438640, penalty approved by the PUC on August 11, 2016.

In the first case, the Attorney General accused IDT Energy, an EGS, of making misleading and deceptive promises of savings; switching customers without their consent (a practice known as "slamming"); and providing inaccurate pricing information. This resulted in overcharges in the amount of $6.5 million. *IDT Energy*, ALJ Decision (11/19/2015) at 36. Under its settlement with the Attorney General, IDT Energy agreed (1) to pay $6,577,000 in refunds; (2) to pay a $25,000 civil penalty; (3) to contribute $75,000 to a local EDC hardship fund; and (4) to modify its business practices. The ALJs approved the settlement in its entirety. Notably, the ALJs rejected an intervenor's objection that the $25,000 civil penalty and the $75,000 contribution to the hardship funds were inadequate to deter future violations. Instead, the ALJs specifically found the $25,000 civil penalty to be "reasonable and in the public interest." *Id.* at 46. The PUC entered a decision adopting the ALJs' recommended approval. *IDT Energy*, PUC Adjudication (6/30/2016) at 67.

In the second case, the Attorney General accused Respond Power LLC, another EGS, of "making misleading and deceptive claims, making misleading and deceptive promises of savings, slamming and failing to provide accurate pricing information." *Respond Power*, ALJ Decision (5/17/2016) at 1. This conduct resulted in approximately $5 million in overcharges to its customers. *Id.* at 19. Under the settlement with the Attorney General, Respond Power agreed (1) to pay $4,122,224.91 in refunds in addition to the $971,279.45 it had already refunded; (2) to pay a $125,000 civil penalty; (3) to contribute $50,000 to EDC hardship funds; and (4) to make modifications to its business practices. *Id.* at 1. The ALJs approved the settlement in its entirety, finding that the $125,000 civil penalty and the $50,000 contribution to the hardship funds constituted a

"reasonable" deterrent and was "in the public interest." *Id.* at 50-51. The ALJs reasoned:

> Although the civil penalty constitutes a small fraction of the amount provided in the Refund Pool, we believe that the provisions of the Settlement must be considered as a whole, not piecemeal. When doing so, the Settlement as a whole deters future violation, is in the public interest and warrants being adopted.

*Id.* at 62. The PUC entered a decision adopting the ALJs' recommended approval. *Respond Power*, PUC Adjudication (8/11/2016) at 1.

Even though HIKO's conduct was very similar to that committed by the respondents in *IDT Energy* and *Respond Power*, it has been ordered to pay a civil penalty that is 73% higher than the penalty in *IDT Energy* and 15% higher than the penalty in *Respond Power*. The conduct of the respondents in *IDT Energy* and *Respond Power* was more egregious because it included violations in addition to their common violation of 52 Pa. Code §54.4(a). IDT Energy and Respond Power engaged in misleading and deceptive practices that included "slamming" customers. I&E never accused HIKO of engaging in such conduct. To the contrary, the ALJs found, specifically, that HIKO did not intend to defraud its customers in its initial price offering:

> [T]here is no evidence to support a finding that HIKO intended in its August offering to defraud customers initially or in advance of the offering. Rather, the testimony is convincing that the company based its offering upon an 18-month historical data which showed price elasticity and stability in the spot market.

ALJ Decision at 51 (internal citation omitted). The ALJs concluded that HIKO's misconduct was limited to one violation, *i.e.*, deviating from the agreed upon discounted rate in violation of 52 Pa. Code §54.4(a).

Notwithstanding these factual differences that favored HIKO, the ALJs imposed a penalty of $1.84 million. This was grossly disproportionate to the $25,000 civil penalty imposed on IDT Energy for its $6.5 million in overcharges, and the $125,000 civil penalty imposed on Respond Power for its $5 million in overcharges. Notably, the ALJs stated that the $125,000 civil penalty imposed on Respond Power was reasonable when the settlement taken "as a whole deters future violation." *Respond Power*, ALJ Decision (5/17/2016) at 62. The ALJs did not consider HIKO's "settlement as a whole" with the Attorney General, which required HIKO to pay $2,025,383.85 into a refund pool (on top of $160,000 it had already voluntarily refunded); $50,000 in expenses to administer the refunds; and $25,000 to the EDC hardship funds. The same ALJs made the decisions in *HIKO*, *IDT Energy* and *Respond Power*. Their different outcomes cannot be reconciled.

The PUC rationalizes the differences by explaining that it applies the ten factors in its Statement of Policy differently for settled and for litigated cases. That Statement of Policy states, in pertinent part, as follows:

> (b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. *When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding. The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest.* The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.

52 Pa. Code §69.1201(b) (emphasis added). Because it does not apply the factors as strictly in a settled case as in a litigated case, the PUC contends that settled cases do not have any precedential value. PUC Adjudication at 26. This rationale is inconsistent with the PUC's own Statement of Policy.

First, the Statement of Policy commits the PUC to look at "past Commission decisions" involving similar misconduct. 52 Pa. Code §69.1201(c)(9). The policy says "past decisions" without regard to whether the decision was made in a litigated case or in a settled case. All penalties, whether reached by settlement or by litigation, require a decision of the PUC. Here, the only "past decisions" that were similar to HIKO's were PUC decisions approving settlements.

Second, in every PUC decision approving a settlement, there must be a finding that the penalty will deter future violations and is in the public interest. The ALJs found that IDT Energy's penalty of $25,000 would deter future violations and was in the public interest. The ALJs needed to explain why HIKO needs to pay a penalty of $1.84 million for the same conduct. The purpose of the penalty is to deter future violations, not to deter litigation. Every utility has the right to be heard.

Third, the ALJs approved the Attorney General's settlement with HIKO as in the public interest, even though it did not include any civil penalty. The Attorney General, instead, looked for a contribution to the EDC hardship funds and the creation of a refund pool.

The PUC imposed penalties against other EGSs for the same violation, arising during the same confluence of weather and market conditions, at a fraction of that imposed upon HIKO. HIKO argues that it did not "elect" to

litigate this case. Rather, I&E never presented HIKO with a realistic settlement of its demand for $15 million in civil penalties and a license revocation. HIKO Reply Brief at 27. Because I&E would not negotiate, HIKO asserts it had no practical alternative except to litigate. HIKO Brief at 48.

Deterrence is a consideration in any civil penalty. A penalty deters the utility subject to the enforcement action from repeating the violation and other utilities from committing a violation. In this way, the PUC maintains discipline in the utility industry. HIKO acknowledges that deterrence requires the exercise of judgment and that the PUC is not obligated to impose the exact same amount of penalty in every overcharge case. HIKO even acknowledges a lower civil penalty is a common feature to a settlement. Nevertheless, the meaning of "deterrence" should not "mean something different in the settlement context than in a litigated case." HIKO Reply Brief at 9. I agree.

The amount of the penalty the PUC imposed in other decisions involving similar, albeit more egregious, misconduct by EGSs was held to be reasonable to deter future violations. This amount ranged from $25,000 to $125,000. If these amounts have been determined to have a deterrent effect against future misconduct, then, logically, all penalties imposed for the same conduct that has already taken place during the same period of time should relate to that range. If the misconduct is repeated during the next polar vortex, that is the time to impose higher penalties in excess of the range of $25,000 to $125,000.

The $1,836,125 penalty violated the excessive fine clauses of the United States and Pennsylvania Constitutions. The majority does not address this point because it concludes that it was waived. I disagree. HIKO asserted in its Answer to I&E's Complaint that the penalty sought by I&E was "grossly

disproportionate." HIKO Answer to I&E's Complaint, New Matter ¶11; R.R. 83a. HIKO's exception to the ALJs' penalty decision also asserted that the civil penalty was "grossly disproportionate." HIKO Exception to ALJs' Initial Decision at 30-31; R.R. 1003a-1004a. A party may identify additional legal authority on appeal to support a claim it raised before a lower court or agency. *See Allegheny County v. Commonwealth*, 490 A.2d 402 (Pa. 1985) (rejecting Commonwealth's waiver claim because the County "merely identified additional legal authority in support of its claims; the County's basic theory is the same[.]"). *Id.* at 413 n.9. HIKO is not asserting a new claim but offering additional legal authority to support its claim that the civil penalty is grossly disproportionate.[8]

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Pennsylvania Constitution contains a similar provision: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." PA. CONST. art. I, §13. Our Supreme Court has observed that the excessive fines clause set forth in the Pennsylvania Constitution is coextensive with the Eighth Amendment to the U.S. Constitution. *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1281 (Pa. 2014).

---

[8] Section 753(a) of the Administrative Agency Law provides that "if a full and complete record of the proceedings before the agency was made such party may not raise upon appeal any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such question) unless allowed by the court upon due cause shown." 2 Pa. C.S. §753(a).

Throughout the administrative proceeding, HIKO challenged the proposed penalty as grossly disproportionate. It challenged I&E's proposed penalty of $14,689,000, and then challenged the ALJs' recommended penalty of $1,836,125. HIKO now challenges the PUC's decision to impose a penalty of $1,836,125 as grossly disproportionate.

To determine whether the excessive fines clause has been violated, a court considers "whether the statutory provision imposes punishment; and if so, whether the fine is excessive." *Commonwealth v. 5444 Spruce Street*, 890 A.2d 35, 38 (Pa. Cmwlth. 2006) (quoting *Commonwealth v. 5444 Spruce Street*, 832 A.2d 396, 399 (Pa. 2003)). The PUC acknowledges that the $1,836,125 civil penalty imposed a punishment. To determine whether that penalty was excessive, we must employ a proportionality analysis, *i.e.*, a comparison of the amount of the fine to the gravity of the offense. *Eisenberg*, 98 A.3d at 1281. Whether a fine is unconstitutionally excessive is a question of law, rendering the standard of review *de novo* and the scope of review plenary. *Id.* at 1279.

In applying the proportionality test, our Supreme Court has pointed to *Solem v. Helm*, 463 U.S. 277 (1983), which directs the court to compare the magnitude of the fine to the treatment of other offenders in the same jurisdiction, and to the treatment of the same offense in other jurisdictions. *Eisenberg*, 98 A.3d at 1282. Our Supreme Court has further noted the special need for "intra-Pennsylvania" proportionality and explained that "comparative and proportional justice is an imperative within Pennsylvania's own borders." *Id.* at 1283 (quoting *Commonwealth v. Baker*, 78 A.3d 1044, 1055 (Pa. 2013) (Castille, C.J., concurring, joined by Saylor and Todd, JJ.)).

It was incumbent on the PUC to ensure that the civil penalty it imposed on HIKO could be harmonized with its other decisions imposing civil penalties on utilities that committed similar violations. It did not do so. Accordingly, the grossly disproportionate civil penalty imposed on HIKO, *inter alia*, violates the prohibition against excessive fines found in both the United States and Pennsylvania Constitutions as well as the PUC's own Statement of Policy.

MHL-17

HIKO also challenges the methodology by which its penalty was calculated. The ALJs found 14,689 violations and then multiplied that number by $125. In adopting this penalty, the PUC found that $125 per violation was appropriate because it was comparable to the average $124 overcharge for customers enrolled in the introductory price discount program. PUC Adjudication at 48. However, the $124 figure, as found by the ALJs, was "per customer" and not per invoice. ALJ Decision at 13, Finding of Fact No. 29 ("[t]he average overcharge that HIKO billed customers was $124"). Under the PUC's own logic, the $125 number should have been multiplied by 5,708, *i.e.*, the number of customers. This results in a penalty of $713,500, which is still higher than any of the penalties imposed in the other cases but would at least be consistent with the PUC's own stated rationale for its penalty decision.

Before the ALJs, HIKO's expert, Charles Cicchetti, explained the difference between a tariff violation and a violation of the regulation at 52 Pa. Code §54.4(a). HIKO's invoiced charges were not illegal in themselves; they simply did not conform to the disclosure statements. The PUC did not approve HIKO's prices; the marketplace set those prices. HIKO's expert opined that HIKO committed one violation, *i.e.*, the decision not to charge at "the agreed upon prices in the disclosure statement" lest it be forced out of business, which would have been more harmful to consumers. 52 Pa. Code §54.4(a). Upon questioning by ALJ Cheskis, Cicchetti conceded that under his logic, each billing cycle could constitute a separate violation, *i.e.*, four violations. R.R. 583a.

However, the finding that HIKO committed 14,689 violations of Section 54.4(a) is not supported by substantial evidence. That number was based upon the number of invoice entries on HIKO's spreadsheets, which included

MHL-18

rebillings, or duplicate invoices, as the PUC acknowledged. Nevertheless, the PUC used the 14,689 figure for the stated reason that "HIKO had the opportunity to correct mistakes in I&E's calculation," and "HIKO's failure to do so resulted in its failure to carry its burden of persuasion once that burden shifted from I&E to [HIKO]." PUC Adjudication at 32-33. The PUC's explanation defies the fundamentals on burden of proof. It was I&E's burden to prove 14,689 violations; it was never HIKO's burden to prove the number of times it violated 52 Pa. Code §54.4(a).

Section 332(a) of the Public Utility Code provides that "[e]xcept as may be otherwise provided in section 315 (relating to burden of proof) or other provisions of this part or other relevant statute, the proponent of a rule or order has the burden of proof." 66 Pa. C.S. §332(a). Factual findings must be supported by substantial evidence, which is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission*, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015).

At the hearing, Cicchetti, HIKO's expert, also testified about the spreadsheets. He explained as follows:

> There were a lot of overcharges where, when you look at the data, there was probably at least 300 instances where it was one of these bills dated one day, and then two days later it was modified and it was another bill. And I'm not sure the customer even saw that. It may have just been between HIKO and the utility.

Notes of Testimony, 4/20/2015, at 210-211 (N.T.__); R.R. 576a-77a. The ALJs accepted this testimony and found that the 14,689 invoice entries included invoices that were subsequently corrected on "re-bills." ALJ Decision at 18, Finding of

Fact No. 69. The ALJs faulted Cicchetti for the stated reason that he was "unspecific about which line items were incorrectly included in the calculations. He also seemed unsure whether the customer was billed the re-bill or not." ALJ Decision at 31. However, it was not Mr. Cicchetti's job to carry I&E's water in proving its case against HIKO.

I&E had the burden to prove that each of the 14,689 invoice entries constituted a separate violation of Section 54.4(a). I&E could have done discovery to establish the actual significance of these invoice entries; it could have also obtained copies of the actual customer invoices. Instead, I&E chose only to present HIKO's spreadsheets. Simply, the ALJs' finding that HIKO violated Section 54.4(a) 14,689 times is not supported by substantial evidence.

The PUC abused its discretion in imposing the $1,836,125 civil penalty. The penalty is grossly disproportionate to the penalties imposed on other EGSs for the same misconduct. As such, the penalty was not consistent with the PUC's own Statement of Policy, and it violated the constitutional proscriptions against excessive fines. The penalty was computed by using a flawed methodology because I&E did not prove that HIKO violated the regulation 14,689 times but only that it generated 14,689 data entries. I would reverse the PUC's order and remand for further proceedings to recalculate a penalty that conforms to the PUC's Statement of Policy and the constitutional limits on penalties.

_____
MARY HANNAH LEAVITT, President Judge

Judge Cohn Jubelirer and Judge Covey join in this dissenting opinion.

MHL-20